**A. P. GREEN FIRE BRICK COMPANY,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 17293.

United States Court of Appeals Eighth Circuit.

Jan. 30, 1964.

Robert J. Griffith, St. Louis, Mo., for petitioner.

William J. Avrutis, Attorney, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, N. L. R. B., Washington, D. C., Dominick L. Manoli, Associate General Counsel, N. L. R. B., Marcel Mallet-Prevost, Asst. General Counsel, N. L. R. B., and Melvin Pollack, Attorney, N. L. R. B., Washington, D. C., for respondent.

Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.

VOGEL, Circuit Judge.

A. P. Green Fire Brick Company, petitioner, seeks to have this court review and set aside an order of the National Labor Relations Board issued against it on February 5, 1963, pursuant to § 10(c) of the National Labor Relations Act, as amended, 61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq. The Board, by its answer, asks that its order be enforced. No question of jurisdiction is involved. The Board's decision and order are reported in 140 N.L.R.B. No. 101.

Adopting the Intermediate Report and Recommended Order of its Trial Examiner, the Board found that petitioner had violated § 8(a) (1) of the Act, 29 U.S. C.A. § 158(a) (1), by making threats and coercive statements to its employees. It further found that petitioner had violated § 8(a) (3) of the Act, 29 U.S.C.A. § 158 (a) (3), by discriminatorily discharging employee Earl F. Docekal. It also found, based upon the Trial Examiner's Report, that petitioner had not engaged in other alleged unfair labor practices and approved the dismissal with respect thereto.

The order of which enforcement is sought requires the petitioner to cease and desist from the unfair labor practices found and from in any other manner interfering with, restraining or coercing its employees in the exercise of their right to self-organization under the Act. Affirmatively, the order directs the petitioner to offer employee Docekal immediate and full reinstatement to his former or substantially equivalent position without prejudice to his seniority or other rights and to make him whole for any loss of earnings he may have suffered because of the discrimination against him, with back pay computed in the customary manner.

In seeking review, petitioner asserts (1) that the Board's findings of interference, restraint and coercion, and that the discharge of employee Docekal was wrongful are not supported by substantial evidence contained in the record as a whole. Petitioner further claims (2) that its president's speeches to the employees dissipated or disavowed any impropriety

that might conceivably have occurred; (3) that employee Docekal's alleged organizational activities were not shown to be within the petitioner's knowledge; and (4) that his discharge was for dishonesty instead of activities in support of unionization.

Petitioner is a Missouri corporation with its principal office and plant in Mexico, Missouri. It manufactures refractory products as well as other items chiefly for the steel, glass, chemical and oil industries. It has locations or markets throughout a good share of the world. Its Mexico, Missouri, plant is the largest individual fire brick plant in existence. It has 23 acres under roof, ranging from one story to five stories high. It is engaged in interstate commerce.

On October 12 and 13, 1961, the National Labor Relations Board conducted a consent election among the company's 641 employees at its Mexico plant. The vote was 316 for the union and 317 against, with 5 challenges. Following objections to petitioner's conduct filed by the union, the Regional Director investigated, set the election aside and held a second election on December 20 and 21, 1961. In the second election the union lost by 29 votes.

The standard by which this court reviews and passes upon fact determinations and orders of the National Labor Relations Board has been well set forth in Bituminous Material & Supply Co. v. N. L. R. B., 8 Cir., 1960, 281 F.2d 365, 367, as follows:

"§ 10(e) of the Act, 29 U.S.C.A. § 160(e) provides that the 'findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.' So does § 10(f). The standards to be applied in the interpretation of this statutory language are set forth in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. It was there held, 340 U.S. at page 488, 71 S.Ct. at page 464, that the 'substan-

tiality of evidence must take into account whatever in the record fairly detracts from its weight'; that this does not mean that this court may displace the Board's choice between two fairly conflicting views; and that this court is not barred from setting aside a Board decision 'when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view'. It was also said, 340 U.S. at pages 492–493, 497, 71 S.Ct. at pages 467–469, that the examiner's findings are not 'as unassailable as a master's'; that his report is as much a part of the record as the complaint or the testimony; and that his findings 'are to be considered along with the consistency and inherent probability of testimony'."

This court in N. L. R. B. v. Morrison Cafeteria Co. of Little Rock, Inc., 8 Cir., 1963, 311 F.2d 534, 538, stated:

" * * * The rule in this Circuit is that 'the question of credibility of witnesses and the weight to be given their testimony' in labor cases is primarily one for determination by the trier of facts. Paramount Cap Mfg. Co. v. N. L. R. B., 260 F.2d 109 (8 Cir. 1958); Kitty Clover, Inc. v. N. L. R. B., 208 F.2d 212, 214 (8 Cir. 1953). See, also, N. L. R. B. v. Walton Mfg. Co., 369 U.S. 404, 407–408, 82 S.Ct. 853, 7 L.Ed.2d 829 (1961). This Court is not the place where that question can be resolved, unless it is shocking to our conscience."

With these standards in mind, we examine the record.

Earl F. Docekal, with whose discharge these proceedings are concerned, worked for petitioner from August 1941 until his discharge on March 5, 1962. At the time of his discharge and for the major portion of the years of his employment, he was engaged as a truck lift operator. His employment record was good. Up to

the time of his discharge he had never been disciplined. Bert Francis, his shift foreman for eight years, could recall of no occasion when he criticized Docekal. In April 1961 Docekal asked the United Brick and Clay Workers Union of America to organize the employees of petitioner's plant at Mexico, Missouri. On the evening of April 14 union organizer McKay held a meeting with Docekal and ten other of petitioner's employees at a union hall located above a local tavern in Mexico. Although the testimony was highly disputed, the Examiner and the Board found that the meeting was under surveillance by two of the company foremen; that when the employees ascertained this, they became frightened. The men in attendance were given a supply of union application blanks and the meeting was broken up. The employees who were there tried to slip out of the building surreptitiously behind other persons who were walking by or else by going into a nearby alley. The Board concluded that the foremen were present for the purpose of observing the union meeting in order to find out which employees attended and that they thereby learned of Docekal's presence, interest and activity concerning union organization. Thereafter Docekal personally signed up 190 employees of the petitioner.

On October 12, 1961, which was the first day of the first election, company foreman Ralph Gallop appeared in a shack under the kiln where a number of employees were eating. He told the employees that, " * * * they would know how we voted after the election because the ballots would be numbered and every man would have a number." Later Gallop in effect reaffirmed his statement, telling the employees that, " * * * he was almost right about the ballots, that it would be our clock number." The Board found, adopting the Examiner's Intermediate Report, that Gallop's conduct would reasonably tend to prevent those in favor of the union from voting and that such plan was plain interference with the employees' rights.

About two weeks prior to this incident, Gallop talked with employee Pierce in the presence of another employee. The testimony indicates:

"He said that he had heard that, he knew how I stood, I was strong on the union, and he would bet $500 that the union did not go in. I said, 'No, I haven't got that kind of money.' He said, 'I will bet $50.' I said, 'I couldn't raise $50 either.' He said, 'If I bet with you it would have to be cash on the board because after the election I would have trouble finding you to collect.' I believe he said, 'You wouldn't be around here any more.' "

Two or three weeks prior to the first election, foreman Gallop also had a conversation with employee William Behan. The record indicates:

"Mr. Gallop said, 'You think that we don't know that you signed a union card.' I said that I never signed one. He said, 'By God, I know the guys who signed the cards, and I have got them right here in my pocket,' and I told him, 'You show me my name on those cards and I will own up to it.' And after that he said, 'I guess you realize if this union goes in your hours will be cut to 32 hours, and more than likely we will move some of our equipment to Arkansas and Albuquerque because we can get labor cheaper there.' Mr. Gallop said, 'If this union gets in,' he said, 'you will have to hunt you up another daddy-in-law with a farm.' "

About three days thereafter foreman Gallop talked to Behan again:

"A. Gallop said, 'About the other day, I want to clarify myself on that, that statement that I made,' he said, 'I meant if the union got in that you would have to have another daddy-in-law with a farm to make up the difference of the 32 hours.'

"Q. What did you tell him in the second conversation after he said this to you?

"A. I said, 'Maybe I misunderstood you.'

"Q. How did you understand him the first time?

"A. I thought the first time he meant if things went union, the union got in, maybe I would lose my job or something."

In explanation, Gallop claimed that he was joking with the employees to whom statements were made. The Examiner and the Board rejected Gallop's explanation. Clearly, credibility was involved, and the Examiner and the Board bore the responsibility of determining credibility. We find such determination to be based on substantial testimony and may not be set aside here. N. L. R. B. v. Morrison Cafeteria Co. of Little Rock, Inc., supra; Paramount Cap Mfg. Co. v. N. L. R. B., 8 Cir., 1958, 260 F.2d 109; Kitty Clover, Inc. v. N. L. R. B., 8 Cir., 1953, 208 F.2d 212. It should also be observed that executives who threaten in jest run the risk that those subject to their power might take them in earnest and conclude the remarks to be coercive. See N. L. R. B. v. Marval Poultry Co., Inc., 4 Cir., 1961, 292 F.2d 454.

▌ In connection with the charge of threats and coercive statements, petitioner relies upon the fact that its president, in pre-election speeches to the employees, assured them of the secrecy of the ballot, that the law prohibited management from threatening or coercing employees and that no member of management would be permitted to do so, and that there would be no discrimination. At the same time, he expressed his opinion that the union would not be beneficial to the employees. In connection therewith, the Board observed:

"The contention that President Lowe's speech had the effect of dissipating Foreman Gallop's coercive conduct must be rejected. It is well settled that statements of neutrality, couched in general language, without any specific reference to, or repudiation of, the prior unlawful conduct of the employee's supervisory personnel do not erase such prior unlawful conduct. See, e. g., Chicopee Manufacturing Corporation of Georgia, supra [1949, 85 N.L.R.B. 1439]; Salant & Salant, Incorporated, [1950] 92 N.L.R.B. 417, 445. President Lowe's speeches did not make any specific reference to, or repudiate any prior unlawful conduct. To the contrary, President Lowe's assurances looked toward the future: that no member of management 'would be permitted' to threaten or coerce. As to Foreman Gallop's insinuation that Respondent would know how each man voted, it is noted that this occurred after President Lowe's speech. It purported to be news as to how the election was actually being conducted and thereby cast doubt upon President Lowe's assurance that the ballot would be secret."

We think the Board very properly rejected petitioner's contention that its president's speeches dissipated or disavowed any conceivably improper conduct that could have occurred. Cf., N. L. R. B. v. Beatrice Foods Co., 10 Cir., 1953, 183 F.2d 726, 728, which affirmed the Board's findings of a statutory violation where, as here, coercive remarks were preceded by assurances to employees "that the ballot would be secret and they could vote according to their own desires without fear of reprisal from the management."

▌ With reference to the discharge of employee Docekal, it is petitioner's first contention that Docekal's alleged organizational activities were not found to be within the company's knowledge. The petitioner, A. P. Green Fire Brick Company, operated a relatively large plant in a relatively small community. Docekal was the prime mover in an almost successful effort in the two elections with reference to representation. The entire union movement could be traced back to the activities of Docekal. He was responsible for the first meeting of employees in the union hall in April 1961 which the Board found was under the surveillance of company supervisors

Freeman and Martin. Docekal thereafter personally signed up 190 workers. Before the first election held in October 1961, Flick, Docekal's immediate foreman, asked him whether he was going to be the union steward and when Docekal denied this, Flick said, "You're kidding." In July 1961 foreman Freeman told William H. Powell, an employee, "I have just heard that Earl Docekal was to get $3,000 if he could get and win an election." Other substantial evidence indicates an awareness on the part of the petitioner and its various supervisors that Docekal was an active supporter of the union, that if the union got in they thought Docekal was going to get paid for it, and that he would be the union steward. The Board's conclusion that the petitioner was fully aware of Docekal's activities is amply supported in the record.

As indicated prior hereto, Docekal had been an employee of the petitioner for over 20 years. He possessed a good record. He had never before been disciplined. Docekal was employed on a piecework basis with a guaranteed minimum hourly rate. He was engaged in transporting materials on shipping pallets. He would get from one to thirty work tickets in a day and handed these in to the timekeeper at the end of each shift for computation of his earnings. Docekal claims he can sign his name but can neither read nor write. He dropped out of school at the fourth grade. At times he had to ask other persons at the palletizing area to read the work request tickets for him. He never changed any work request tickets himself, but always asked either his foreman or the timekeeper to make necessary changes when work called for on the work tickets was not fully performed. His foreman, knowing of Docekal's limited ability, sometimes changed his tickets without request. Foremen Flick, Francis or Stubblefield filled out forms for the company's records for him. General foreman Fetterhoff once offered Docekal a job as shed captain, only to find that Docekal's education was inadequate for the job. Docekal has never voted in a civic election.

Approximately two weeks before Docekal's discharge on March 5, 1962, the petitioner put his work under close surveillance. When Docekal finished loading a boxcar foreman Flick would go in and raise and lower the stacks in order to check the work, something he had not done before. In this two-week period he required Docekal to re-do work a half dozen times. Previously Docekal re-did work perhaps once a month. On February 14th, 19th and 28th Docekal turned in work cards which included work he had not actually performed. Although in each instance the foreman in charge was aware of the error, he did not call it to Docekal's attention and made no effort to change or correct the work tickets as had been past custom. The February 14th overcharge resulted in an excess credit to Docekal of 43 cents. The February 19th overcharge resulted in excess credit to Docekal of 41 cents. The February 28th overcharge resulted in a credit to Docekal of $2.69, or a total of $3.53 for the three instances. At a management meeting, Docekal was discharged for dishonesty, not negligence or mistake.

Petitioner insists that an incentive or piecework plan is wholly dependent upon the honesty of the employees who operate under it; that it, without deviation, has had a rule or policy that any employee detected in a dishonest act where the motive was also one of dishonesty was to be discharged, and that this was true regardless of the amount involved or the length of service of the employee involved. It claims that as a matter of policy it has never given warnings in such matters. A difficult situation was presented for the Board's determination. The evidence is not overwhelming one way or the other. The Board concluded, however, that Docekal, who apparently had been a faithful and good employee for over 20 years, was discharged because of his union activity and not because of the errors found in the three work tickets referred to.

As this court observed in N. L. R. B. v. Solo Cup Co., 8 Cir., 1956, 237 F.2d 521,

525, " \* \* \* A justifiable ground for dismissal is no defense if it is a pretext and not the moving cause." The Board's conclusion that the discharge of Docekal for alleged dishonesty was merely a pretext and not the moving cause is based upon (1) his faithful service of over 20 years, (2) the change in treatment of him by his foremen after the elections, (3) the close surveillance of his work, (4) the failure to advise him of the errors, (5) the failure of his foremen to make corrections as they had done in the past, and (6) that while petitioner claimed that it had an unvarying policy of discharge in cases of dishonesty regardless of the amount, it failed to apply that alleged policy in other similar instances. The record indicates that subsequent to Docekal's discharge one Fred Hahn succeeded him in the operation of his truck. Whereas Docekal had an excellent record showing no disciplinary action ever taken against him and no criticism over the preceding eight-year period, Hahn's record was far inferior. Hahn himself stated that he had failed to ring out his time card and had been warned about it "two hundred fifty-seven times". This meant that Hahn would be paid for work not done by him. Despite the numerous warnings, he was not discharged but only reprimanded and suspended for three days. Another employee, Elwood D. Crum, was also found to have turned in work tickets which falsely showed that he had pulled a number of hot cars from the kiln. Crum's actions were deliberate and caused by his desire to retaliate against employees of the previous shift whom he believed to be not doing their fair share of work. He was told he would be suspended for one week with a reprimand put in his personnel file. He accepted the suspension but asked that the black mark not be put upon his record. It was explained to him that his request could not be granted because what he had done "was like stealing from the company".

We conclude here that there is substantial evidence to support the Board's findings that Docekal was discriminatorily discharged because of his union activity and that the errors in his work records were not the moving cause of his dismissal but, rather, were a mere pretext. We are fully aware of the contradictory and disputed testimony and of the fact that different conclusions could be reached by reasonable persons. In holding that the Board's findings are based on substantial evidence, we have considered the record as a whole and have "take[n] into account whatever in the record fairly detracts from" the weight of the substantiality of the evidence. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456.

The Board's request for an enforcement order will be granted