**UNITED STATES RUBBER COMPANY,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 23129.

United States Court of Appeals Fifth Circuit.

Oct. 25, 1967.

Rehearing Denied Feb. 6, 1968.

---

Theo F. Weiss, San Antonio, Tex., Seymour Swerdlow, New York City, for petitioner, United States Rubber Co., Clemens, Knight, Weiss & Spencer, San Antonio, Tex., Arthur, Dry, Kalish, Taylor & Wood, New York City, of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Glen M. Bendixsen, Atty., N.L.R.B., Arnold Ordman, Gen. Counsel, ·Dominick L. Manoli, Associate Gen. Counsel., Warren M. Laddon, Atty., N.L.R.B., Washington, D. C., for respondent.

Before WISDOM, COLEMAN and GODBOLD, Circuit Judges.

WISDOM, Circuit Judge.

This labor case is a run of the mine suit involving an employer's alleged violations of Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act, 25 U.S.C. § 151 et seq. The United States Rubber Company petitions the Court to review and set aside an order of the National Labor Relations Board issued November 5, 1965. The Board found that

the Company (1) had violated Section 8(a) (1) by coercing and threatening its employees concerning their organizational rights and (2) had violated Sections 8 (a) (3) and 8(a) (1) by discriminatorily discharging two employees because of their labor activities. 155 NLRB No. 161. The Board cross-petitions for enforcement of its order requiring that the two discharged employees be reinstated and that the Company cease its unlawful coercion. We hold that substantial evidence in the record as a whole supports the Board's findings. We grant enforcement of the Board's order.

## I.

This case grew out of a union [1] organizing campaign at the Company's tire testing facility in Laredo, Texas. The discharged employees, Sam Brewster and Jesus Morales, were discharged following incidents that, standing alone, might have justified dismissal in any business context.[2] But the incidents do not stand alone. Brewster and Morales were two of the three co-chairmen of the Union organizing committee and were the leading proponents of unionizing the facility. At various meetings, two with the entire work force and one with eight of the principal union adherents, the plant manager, Maurice Williams, had made it

clear that he was opposed to the formation of a union by the Laredo test fleet employees. Both Brewster and Morales had argued in support of the union at these meetings, in effect, according to the Company, "talking back" to Williams in the presence of the other employees. Williams warned that the formation of a union could well result in the loss of jobs by the employees. The Board found that these remarks went beyond the type of mere "economic forecast" which are permissible under § 8(c) of the act. See N.L.R.B. v. Transport Clearings, Inc., 5 Cir. 1962, 311 F.2d 519, 523–524. Williams suggested, at the meeting with the eight union adherents, including Brewster and Morales, that they could be fired for their "past mistakes" and told them "I am just telling you to start looking for another job because you won't be working here long." These meetings took place just after the management had learned of the organizing campaign, and thus well before it could be determined that the union might acquire the support of a majority of the employees. Perhaps most damning is the fact that both Brewster and Morales were summarily discharged after reports of their misconduct (both made by the same company supervisor) without being given any opportunity to explain or give their ver-

---

1. United Rubber, Cork, Linoleum and Plastic Workers of America, AFL-CIO.

2. Brewster was summarily discharged for allegedly violating the Company's safety rules by cutting too sharply in front of another car on the high-speed test track. He was given no opportunity to explain his version of the incident. Brewster had previously been accused of entering the high-speed track without coming to a stop at the entrance ramp; driving faster than the required speed during a test run, thus affecting the validity of the test; following too closely behind another car during a highway test; and failing to position properly an adjustable test steering column. The examiner found that there were extenuating circumstances for all of these violations, and that Brewster had not been warned that they were being held against him.

Morales was discharged for following too closely behind another car during a high-

way test run and for failing to position properly a test steering column. He also was given no opportunity to explain his version of these incidents. He had previously been given a disciplinary lay-off for allegedly having been negligent in allowing gasoline to spill while servicing a test vehicle. He had had two accidents while driving test vehicles on the highway, but at the time they occurred he was not considered to have been at fault.

It is not without significance that the original complaint in this case alleged the unlawful discharge of four employees, and that the Trial Examiner, after a lengthy and thorough hearing, found that only two of these were supported by the evidence. Rejecting the objections of both the General Counsel and the Company, the Board adopted the thorough and thoughtful decision of the Trial Examiner as its own.

sions of the incidents. This and other evidence supports the Board's conclusion that Williams was looking for any infraction by Brewster and Morales that might ostentibly justify discharging these employees.

■ The Company relies, in part, on certain alleged admissions Brewster and Morales made at the hearing. These appear to be after-the-fact rationalizations. The knowledge and motive of the employer at the time of the discharge control the question whether a discriminatory purpose was involved, and not what the employer may have learned at a later date. "Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with one specific definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a) (3) forbids." N.L.R.B. v. McGahey, 5 Cir. 1956, 233 F.2d 406, 413. Here, taking the record as a whole, there is substantial evidence to support the Board's conclusion that the motivating purpose of the discharges of Brewster and Morales was to discriminate against them because of their leadership in the Union. Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; N.L.R.B. v. Walton Mfg. Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829, on remand, 5 Cir. 1963, 311 F.2d 541 and 322 F.2d 187; N.L.R.B. v. Camco, Inc., 5 Cir. 1965, 340 F.2d 803. "[T]he initial choice between two equally conflicting inferences of discriminatory or non-discriminatory employer motivation for an employee discharge is primarily the province of the Board * * *." N.L.R.B. v. Coats & Clark, Inc., 5 Cir., 231 F.2d 567, 572.

## II.

■ The alleged § 8(a) (1) violation must, of course, be considered in conjunction with the unlawful discharges which actually occurred. Threats of reprisals for union activity which may be innocuous standing alone become coercive and unlawful when they are a part of a pattern that includes actual indications that the threats were real. Cf. N.L.R.B. v. Transport Clearings, Inc., 5 Cir. 1962, 311 F.2d 519, 523. Here Williams told the assembled employees that, in his opinion, if the facility were unionized the company would be forced to subcontract much of the work done there and thus lay off about half of the work force. This might be treated as a permissible economic prediction, had Williams stopped there. Instead, he threatened the principal union organizers by lightly veiled threats that the men would be singled out for reprisals and should begin to look for other jobs. In addition, Williams told the general meeting of all employees that he had an informer who kept him apprised of the union activity, that he would know who attended the meetings, and that such persons should start looking for another job.

The Company urges that whatever coercive effect there may have been in the statements and actions of Williams were neutralized by the posting of a notice signed by W. J. Dobie, Manager of Product Evaluation for the Company, in general charge of the Laredo operations and Williams's superior. Dobie's office was in Detroit. The notice was posted for several weeks on a bulletin board, which the employees were required to look at regularly. It included the following statement:

It is not necessary to join a union and we would prefer that you do not. It should be noted, however, that the Company appreciates its legal obligations in this matter and has not, nor will it in the future, discriminate against employees because of lawfully conducted union activity, nor will we dismiss employees or close existing facilities merely to avoid dealing with unions.

Williams read aloud this notice at a meeting of employees.

We agree with the Board that this general notice from a distant executive would not be significant in the face of threats from the local management—the

immediate source of the power to hire and discharge. "[S]ubsequent assurances of neutrality through its managerial executives * * * did not, in fact or in law, erase the coercive effect of these prior intimidatory statements". N.L.R.B. v. Armstrong Tire & Rubber Co., 5 Cir. 1955, 228 F.2d 159, 161. See also N.L.R.B. v. Fulton Bag & Cotton Mills, 5 Cir. 1949, 175 F.2d 675; A. P. Green Fire Brick Co. v. N.L.R.B., 8 Cir. 1964, 326 F.2d 910.

We hold that substantial evidence supports the Board's decision on both the § 8(a) (3) and the § 8(a) (1) violations. The order will be enforced.