## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## ESCO ELEVATORS, INC., Respondent.

No. 83–4724

Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

July 16, 1984.

Elliott Moore, Deputy Associate General Counsel, N.L.R.B., Washington, D.C., for petitioner.

Mueller & Mueller, Fort Worth, Tex., Durwood D. Crawford, Dallas, Tex., for respondent.

1. 267 NLRB No. 119 (1983).

Michael Dunn, Director, Region 16, N.L.R.B., Fort Worth, Tex., for other interested parties.

Before RUBIN, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Esco Elevators, Inc., petitions to review and set aside an order[1] of the National Labor Relations Board (Board) adopting the findings and conclusion of an administrative law judge that Esco violated section 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3), by discharging Charles McKinney because of his union activities and activities toward improving safety and working conditions. The Board cross-petitions for enforcement of its order. We remand the case to the Board for further consideration.

I.

Esco is a Texas corporation with an office and principal place business located at Fort Worth, Texas, and a branch office and place of business located at Euless, Texas, where it is engaged in the manufacture, sale and installation of hydraulic passenger and freight elevators as well as the repair and servicing of elevator installations when completed. For many years, it has recognized as part of any industry-wide bargaining unit the Union of Elevator Constructors as the collective bargaining representative of its production and maintenance employees.

Charles McKinney began his employment with Esco as a route service mechanic in July 1974 and worked continuously until his resignation on May 3, 1977. On May 17, 1978, McKinney was rehired by Esco in his former position. At the time of his resignation and at the time of his rehiring, McKinney was serving as the vice presi-

dent of his union local and a member of the union's executive board. In early 1980, he was elected president of the union local.

Sometime in June 1980, after the collective bargaining agreement between Esco and the union had expired, negotiations for a new agreement reached a stalemate. The union then decided to engage in a "park and walk" job action. Most of the employees used their own cars while working and subsequently were reimbursed by the company. One day in June 1980, the employees drove to Esco's parking lot and parked their personal vehicles. McKinney, serving as their spokesman, then told Jack Payne, Esco's district supervisor, that the employees would not use their personal vehicles to perform company business. Bobby Earl Stroud, the union steward, and McKinney, who were provided with company trucks, offered to transport the employees to their work sites in those trucks. When Payne refused to agree, McKinney and Stroud also refused to work. Payne then went outside where he told the assembled employees: "What are you guys? Just a bunch of sheep? You're going to let some guy from the Union Hall play God and tell you whether you can work or not?" The job action lasted one work day.

In June 1980, McKinney began to complain about a safety problem in one of the elevator installations he serviced. At Lakeland Manor in Dallas, the elevator units had been installed without sufficient clearance in the high voltage area. According to OSHA regulations, the chest-high clearance was fourteen inches too short and the overhead clearance was ten inches too low. Consequently, when an employee was repairing an elevator, he was in danger of being severely shocked because he was wedged in a small area, unable to keep clear of a surface which conducted electricity.

McKinney first complained about the safety problem to Payne and Lawrence Hueber, the service supervisor, while attending a company school. At a meeting between management and employees in October 1980, McKinney again complained about the Lakeland Manor elevators. In that same month, McKinney raised the problem with the union's business representatives who called Payne about the problem. Sometime later, the union's business representatives again complained to Payne about the problem.

In November 1980, McKinney received an electrical shock while repairing an elevator transformer. Again he complained to Payne and Hueber about the problem and asked when they were going to do something about it.

Sometime thereafter, Payne had a conversation with Hueber about why so much interest was being taken in the Lakeland Manor problem. After Hueber attributed the interest to the fact that McKinney was president of the union and that he was going to "press it," Payne said, "Well, to hell with it," and indicated that Esco would take its time in dealing with the problem.

On November 26, 1980, an agreement was reached between Marshall Crouch, another route service mechanic, and McKinney whereby McKinney would pick up and carry the time cards of Crouch and some other employees to the office in Euless. Some misunderstanding resulted in neither Crouch's nor McKinney's seeing each other at the location where McKinney was to receive the time cards, causing Crouch to have to drive to Euless to deliver them.

As McKinney and Bobby Earl Stroud were leaving the office in Euless, Crouch approached and in an abusive and threatening tone demanded to know why McKinney had not picked up the time cards. After arguing briefly, McKinney and Crouch engaged in a brief fist fight during which both men suffered facial lacerations. After his fight with McKinney, Crouch struggled briefly with Stroud. All the combatants then left the premises.

Near closing time, Payne returned to his office and was told about the fights. Payne laughed about it and commented, "Oh, hell, when are these boys going to grow up?" He later asked who struck the first blow.

Later that evening, Payne went by Crouch's home to check on his condition and discussed the fights with him. He also reported the incident to his supervisor, Clem Young, and was instructed by Young to make an investigation of the matter and report his findings to Young.

On Monday, December 1, 1980, Payne again discussed the fight with Crouch. This discussion was the only investigation Payne conducted until after McKinney was fired. Payne did not discuss the incident with Stroud or McKinney.

On December 3, 1980, Payne called McKinney and told him that he wanted to meet and talk with him about the "Lakeland Manor job." On December 5, 1980, Payne, accompanied by Esco's sales representative, James Jeoffroy, met with McKinney at Lakeland Manor. Once again, McKinney complained about the safety problem and asked that it be corrected. Payne became angry and suggested they go to a restaurant for coffee. There, Payne excused himself and made a telephone call to Young and reported that his investigation of the fight showed that McKinney had struck the first blow.[2] Young then authorized Payne to discharge McKinney.

Payne asked McKinney to resign. When he declined to do so, Payne discharged him. McKinney then brought up the subject of the fight with Crouch and gave Payne his version of the incident.[3] Despite the fact that he was engaged in two fights, no disciplinary action was taken against Crouch.

On the basis of these facts, the Board, in agreement with the administrative law judge, rejected Esco's contention that McKinney was discharged for an unjustified act of aggression. Instead, it found that Esco violated Section 8(a)(1) and (3) of the Act, by discharging McKinney because of his union and safety-related activities. According to the Board, "the fight between Crouch and McKinney provided [Esco] with a convenient excuse to rid itself of an employee whose union and protected activities had become a definite annoyance."

## II.

■ On review, we must decide whether, based on the entire record before us, substantial evidence sustains the Board's conclusion that McKinney's discharge was partly or wholly motivated by Esco's antipathy toward his protected union or safety-related activities. The question of motive is one of fact, and the Board's determination will not be overturned if its conclusions drawn from credibility findings and inferences from the evidence are reasonable. Where the Board's conclusions are reasonable, it does not matter that we might have reached a different result had we been the factfinder. *NLRB v. Gulf States United Telephone Co.*, 694 F.2d 92 (5th Cir.1982); *Berry Schools v. NLRB*, 653 F.2d 966 (5th Cir.1981). In determining whether the Board's decision is supported by substantial evidence, we must also consider that evidence which fairly detracts from the Board's decision. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ Applying these principles to this case, we find that the Board's decision that McKinney's discharge was motivated wholly or in part by his participation in the June 1980 "park and walk" incident is not supported by substantial evidence. Indeed, we cannot find a single fact which establishes a basis from which the Board could reason-

---

**2.** Payne testified that he asked McKinney about the fight before a decision was made on his discharge. As the Board found, it is clear that the administrative law judge credited McKinney's testimony that Payne did not talk to him about the fight until afterwards. This credibility determination is supported by substantial evidence. *NLRB v. Southern Plasma Corp.*, 626 F.2d 1287, 1291 (5th Cir.1980).

**3.** Approximately a year prior to the fight with Crouch, McKinney had been involved in a fight with another employee. This fight was observed by Young who did not discipline or give either employee a formal reprimand. He did advise McKinney that he shouldn't fight. No mention was made of this incident at the time of McKinney's discharge.

ably draw inferences that McKinney's discharge was motivated by this incident.

In making this finding, the Board appeared to rely solely on the statement in which Payne referred to the employees' allowing "some guy from the Union Hall [to play] God and tell you whether you can work or not." There is simply no basis from which it can be inferred that this remark referred to McKinney as opposed to one of the union's business representatives. Indeed, McKinney himself testified that Payne, by his remark, was referring to a union official located at the union hall.

Furthermore, certain evidence and the lack thereof fairly detracts from the Board's decision that McKinney's discharge was motivated by his participation in the "park and walk" incident. There is no evidence that McKinney's participation in this incident was regarded as being greater than that of the other employees. There is no evidence of any threats of disciplinary action being made against McKinney or any of the employees as a result of the job action. There is no evidence that Payne or any other company official harbored any animosity against those employees who participated in the job action. Finally, some six months had passed between the date of the "park and walk" job action and the date of McKinney's discharge.[4]

In conclusion, after having examined the record, we are unable to find any affirmative proof of a causal connection between McKinney's participation in the "park and walk" job action and his discharge.

We reach a different conclusion, however, with respect to the Board's decision that McKinney's discharge resulted wholly or in part from his safety-related complaints. Initially, we note that the evidence demonstrated that Payne was responsible for determining whether McKinney was to be discharged. It was he who was to determine whether McKinney was the aggressor in the Crouch-McKinney fight. Payne was distressed and irritated by McKinney's safety-related complaints. Payne failed to obtain McKinney's version of the fight before deciding that he was the unjustified aggressor.[5] Crouch, although somewhat at fault, was not disciplined in any manner as the results of the *two* fights he had on November 26, 1980. Finally, the harsh disciplinary treatment afforded McKinney is in sharp contrast with the company's earlier attitude about fighting.[6]

Overt direct evidence of an unlawful motive is not a prerequisite to a finding that disciplinary action resulted therefrom. *NLRB v. Brookwood Furniture Division of U.S. Industries*, 701 F.2d 452 (5th Cir. 1983). Here, substantial, albeit circumstantial, evidence was presented which allowed the Board to find that McKinney's discharge was motivated, at least in part, by animus toward his safety-related complaints.

Our holding that substantial evidence supported the finding that safety-related complaints were a motivating factor behind McKinney's discharge, however, does not end our inquiry. We must decide whether the Board was correct in finding that a

---

**4.** The length of time between the date of discharge and the date of the "park and walk" job action weighs heavily against a finding that McKinney's discharge was motivated thereby. *NLRB v. Kay Electronics, Inc.,* 410 F.2d 499 (8th Cir.1969). This is particularly true when the record offers no evidence that Payne or other company officials, as the result of this incident, were inclined to fabricate a pretext for McKinney's discharge.

**5.** A one-sided investigation into employee misconduct supplies significant evidence that disciplinary action was triggered by an unlawful motive. *See United States Rubber Co. v. NLRB,*

384 F.2d 660, 662–63 (5th Cir.1967); *NLRB v. Baker Hotel of Dallas, Inc.,* 311 F.2d 528, 533 (5th Cir.1963).

**6.** No disciplinary action was taken against McKinney as the result of his earlier fight with Roy Boring. It appears that this resulted from the fact that this fight resulted from a "true misunderstanding." Certainly, the same can be said of the cause of the Crouch-McKinney fight. Furthermore, McKinney was not warned, explicitly or implicitly, that a subsequent fight would result in any disciplinary action, much less termination.

discharge so motivated was violative of the Act.

■ It is unclear whether the Board found that McKinney's discharge constituted an independent violation of section 8(a)(1) of the Act. For this to be so, McKinney's safety-related complaints must have amounted to protected concerted activity. For the activity of a single employee to be concerted, it must be "engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees." *Anchortank, Inc. v. NLRB*, 618 F.2d 1153 (5th Cir.1980), *quoting Mushroom Transportation Co. v. NLRB*, 330 F.2d 683, 685 (3d Cir.1964); *see also Scooba Mfg. Co. v. NLRB*, 694 F.2d 82 (5th Cir.1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 1706, 80 L.Ed.2d 180 (1984).

■ There is no showing here that McKinney's safety complaints were made to enlist the support of other employees or that they had some relation to group action in the interest of employees. His complaints related solely to his job assignment. He never sought to expand his complaint beyond that. There was no showing that he spoke for other employees. No employees authorized him as their spokesman. So far as the record shows there was no concern among the employees as a group over the Lakeland Manor safety problem. Therefore, based upon this record, McKinney's safety-related complaints would not amount to a protected concerted activity. A finding that his discharge, having been motivated by animus toward his safety-related complaints, violated section 8(a)(1) would not be supported by substantial evidence.[7]

■ While McKinney's discharge would not have violated section 8(a)(1) of the Act,

it would have violated section 8(a)(3) of the Act if McKinney's safety-related complaints were a union endeavor and not a mere individual undertaking. *NLRB v. Laney & Duke Storage Warehouse Co.*, 369 F.2d 859 (5th Cir.1966), *citing NLRB v. Bowman Transportation, Inc.*, 314 F.2d 497 (5th Cir.1963). *See also Metal Blast, Inc. v. NLRB*, 324 F.2d 602 (6th Cir.1963).

While the Board specifically found that McKinney's discharge violated section 8(a)(3), i.e., motivated by union activity, we are unable to tell from the administrative law judge's decision or the Board's decision whether the union activity upon which that finding was based was the June job action or the safety-related complaints. The basis for this finding is all the more indiscernible because the administrative law judge's decision and the Board's decision, as well as the Board's brief, place great emphasis upon the June job action as the union activity which motivated the discharge. Therefore, we are compelled to remand this cause to the Board for a determination of whether the safety-related complaints constituted a union endeavor within the meaning of our decisions cited *supra* as opposed to a personal undertaking. If the Board finds that the safety-related complaints were a union endeavor, McKinney will be entitled to reinstatement. If it finds that the complaints were no more than a personal undertaking, McKinney will not be entitled to reinstatement. Regardless of the finding made on remand, we are confident that the Board will articulate its supporting rationale so as to allow this court to perform its appellate function of making a determination as to whether it is supported by substantial evidence.

ENFORCEMENT DENIED AND CAUSE REMANDED.

---

**7.** We note that the Board has recently adopted a new standard pursuant to which it will find that an employee's activity is concerted if it is engaged in with or on the authority of other employees. *Meyers Industries, Inc.*, 268 NLRB No. 73 (1984). Because McKinney's safety-related complaints do not meet our *Anchortank-Scooba* test for determining the existence of protected

concerted activity violative of section 8(a)(1) of the Act, we do not find it necessary to determine whether the Board's decision in *Meyers Industries* should be applied to this case. We note, however, that it appears that McKinney's safety-related complaints would not meet the *Meyers Industries* test.