**UNION–TRIBUNE PUBLISHING COMPANY, Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner,**

and

San Diego Newspaper Guild, Local No. 95 of the Newspaper Guild, AFL–CIO, CLC, Intervening Respondent.

Nos. 92–1978, 92–2348.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 13, 1993.

Decided July 20, 1993.

E. Andrew Norwood, Howard M. Kastrinsky, King & Ballow, Nashville, TN, Paul H. Duvall (argued), King & Ballow, San Diego, CA, for petitioner/cross-respondent.

Charles P. Donnelly, Jr., John C. Truesdale, John Fawley (argued), N.L.R.B., Contempt Litigation Branch, Aileen A. Armstrong, William M. Bernstein, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, Robert R. Petering, N.L.R.B., Counsel for the Gen. Counsel, San Diego, CA, Victoria E. Aguayo, N.L.R.B., Region 21, Los Angeles, CA, for respondent/cross-petitioner.

Richard D. Prochazka, San Diego, CA, for intervening-respondent.

Before CUDAHY, FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

The central issue in this case is whether substantial evidence supports a decision by the National Labor Relations Board (the Board) that Union–Tribune Publishing Company (Union–Tribune) fired Nancy Tetrault from her job as a district circulation manager because of her union activities. Although the question is close, we conclude that the Board's order is supported by substantial evidence, and we therefore enforce it.

## I.

We begin by presenting the facts as found by the Administrative Law Judge (ALJ). In 1979, Nancy Tetrault began working for Union–Tribune, a publisher of two daily newspapers in San Diego County, California, as a relief district manager in the circulation department. After serving in several managerial positions in other districts, Tetrault requested a transfer to the manager's post for District 128. The job of a district manager is to coordinate daily delivery of the newspaper within a discrete geographic area. Among her tasks are hiring route carriers who perform the deliveries, collecting subscription payments, and ensuring that each customer

receives a paper every day. Because District 128 was located in a low-income, crime-ridden area, its manager had to overcome many problems such as customers who were unavailable for collection, frequent service errors, and unreliable carriers. Tetrault nevertheless wanted the job, and she received it in November, 1985.

In December, 1987, Tetrault became a member of the executive committee of her union, the San Diego Newspaper Guild. Union–Tribune and the Guild began negotiations in March, 1988 for a new collective-bargaining agreement. Tetrault herself became a member of the bargaining committee and took several days off from work to attend negotiation sessions. In June, Tetrault received her review for the first quarter of 1988. The report documented poor performance. In particular, customer complaints were 50% higher than the approved level for her district, which was already set at twice the level of any other district. No disciplinary action was taken against Tetrault at the time, but she was warned that she must do better. As a result of this review and her perceived need to refocus her energies on her work, Tetrault subsequently withdrew from the negotiating committee. Coastal Circulation Manager Richard Julian told her shortly thereafter that he was "glad that she had her priorities in the right place."

Tetrault's troubles grew serious during the summer of 1988. She had planned to take an extended vacation, and prepared a lengthy list of assignments for Glen Harms, the vacation relief manager for her district. Although Union–Tribune maintains that Harms successfully completed all his assignments but one, the ALJ found that the district was in "considerably worse shape" when Tetrault returned. Toward the end of Tetrault's vacation and continuing for two weeks afterward, a television documentary entitled "The Non–Union Tribune" aired ten times on local cable channels. Produced by local college students and taking an unabashedly pro-union stance, the program portrayed Union–Tribune's efforts to break the Guild during their collective-bargaining negotiations. Tetrault was featured prominently in the program, especially in one scene that showed her delivering a speech to a cheering Guild audience and denouncing Union–Tribune and its "carpetbagging" law firm. Tetrault testified that after her return Division Manager Don Resch (Tetrault's immediate supervisor) told her that he had seen her on the program and that he thought "everyone" had seen her.

In September, Tetrault received her performance review for the second quarter of 1988. Because she failed to submit on time her route profit breakdowns (RPBs)—reports detailing payments made to carriers and profits or payments due to the company—she was suspended for one day. In what they described as an attempt to give her a "fresh start," Resch and Julian offered Tetrault the opportunity to transfer to District 122, the best-performing district in the system. She accepted. Her transfer would become final, however, only upon completion and submission of all the outstanding RPBs for District 128. That task proved far more difficult than anticipated, due in large part to Tetrault's additional responsibility during that period for District 122. About this time, Division Manager Wesley Bates told Tetrault that the union shop was on its way out, and that "[i]t won't exist when we're done with this negotiation." Tetrault's deadline for submitting the July through September RPBs was extended several times in October. The RPBs she eventually submitted for July and August were not signed by the carriers, as they should have been.

Meanwhile, two Union–Tribune officials had begun investigating complaints by District 128 carriers that they had not been paid. These officials also looked into accounting documents, timecards, and cash turn-in sheets that showed irregularities. As a result of their discoveries, Union–Tribune held a meeting with Tetrault on October 28 to discuss her handling of various financial matters; according to Union–Tribune, Tetrault admitted at the meeting to using collections from prior months to pay certain carriers and commingling collections from different paper routes. On November 1, Tetrault was indefinitely suspended for gross misconduct pending further investigation. After another meeting with Union–Tribune on No-

vember 11, she was formally fired effective November 17.

The Guild filed two unfair labor practice charges against Union–Tribune and requested an explanation of the specific reasons why Tetrault was discharged. On January 13, 1989, Union–Tribune sent the Guild a ten-page letter listing some eighty-two reasons for her firing. The ALJ conducted a lengthy hearing on the charges and concluded that Union–Tribune had violated sections 8(a)(3) and (a)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(3) and (a)(1).[1] The ALJ gave strong weight to Tetrault's testimony, calling her "an eminently credible individual" and finding that she was a conscientious employee who applied all her effort to tackling the virtually insuperable problems of District 128. The ALJ examined in great detail each of Union–Tribune's purported grounds for discharging Tetrault. Contrary to their allegations, he concluded that there was no convincing evidence that she had stolen money or engaged in any financial misconduct. In fact, the ALJ believed that the company's investigation was a sham, undertaken so that Union–Tribune could "rid itself of an ardent union activist." The ALJ placed heavy emphasis on the fact that Union–Tribune never informed Tetrault of the specific charges against her so that she could rebut them, either at the October 28 or November 11 meetings. Union–Tribune's failure to allow Tetrault to defend herself, the ALJ determined, by itself showed that its offered reasons for firing her were pretextual.

On review, the Board acknowledged two shortcomings in the ALJ's decision. First, it was incorrect for the ALJ to infer an improper motive for Tetrault's discharge from Union–Tribune's denial of information about the charges against her. Grievances had been filed in August and September that Union–Tribune was discriminating against Tetrault in violation of section 8(a)(3). There is no right to prehearing discovery for a pending section 8(a)(3) charge, see, e.g., WXON–TV,

289 N.L.R.B. 615, 617–18 (1988), and furnishing information about the November suspension and discharge would have provided information about the earlier pending charges as well. Union–Tribune was thus acting within its rights when it rejected Tetrault's requests.

Second, and more seriously, the ALJ never formally determined that antiunion animus had motivated Union–Tribune's actions against Tetrault, a prerequisite for finding a violation of the NLRA. The ALJ concluded that the reasons offered for Tetrault's discharge were pretextual, but never found that antiunion animus was the real reason for the company's action. Nevertheless, the Board cited five pieces of evidence in the ALJ's decision that supported an inference of animus. (1) Union–Tribune's division manager told Tetrault, while she was serving on the Guild's bargaining committee, that "the union shop was out and it would not exist at the end of negotiations." (2) A meeting was held for Union–Tribune managers to watch a videotape broadcast of the documentary during which Tetrault chastised Union–Tribune management. (3) Richard Julian told Tetrault that her decision to resign from the bargaining committee showed that she had gotten her priorities straight. (4) The relationship between the bargaining parties was at a forty-year low. (5) The Guild had filed a bad-faith bargaining grievance against Union–Tribune. These factors, plus the ALJ's determination that Union–Tribune's reasons were pretextual, supported a finding that antiunion animus motivated Union–Tribune's actions at least in part.

## II.

### A.

The procedure for analyzing unlawful discharge cases through the use of shifting burdens of proof was laid out by the Board in *Wright Line*, 251 N.L.R.B. 1083 (1980), *enf'd on other grounds*, 662 F.2d 899

---

**1.** Under section 158(a)(1), it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." Under section 158(a)(3), it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

(1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), and approved by the Supreme Court in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). Under the Board's approach, the General Counsel of the Board bears the initial burden of proving by a preponderance of the evidence that the employee's protected conduct was a substantial or motivating factor in her discharge. *See Transportation Management,* 462 U.S. at 400, 103 S.Ct. at 2473. As another way to state this requirement, the General Counsel must prove that the employee's discharge was based on antiunion animus or that such animus was a substantial factor. *See J. Huizinga Cartage Co. v. NLRB,* 941 F.2d 616, 620 (7th Cir.1991). If this requirement is met, then the burden shifts to the employer to prove by a preponderance of the evidence that the employee would have been fired anyway for a valid reason. *See Transportation Management Corp.,* 462 U.S. at 400, 103 S.Ct. at 2473; *NLRB v. Industrial Erectors, Inc.,* 712 F.2d 1131, 1136 (7th Cir. 1983). The initial demonstration of illegal motive need not depend on direct proof; circumstantial evidence that a dismissal was improperly motivated may be sufficient to make the prima facie case against the employer. *See Livingston Pipe & Tube, Inc. v. NLRB,* 987 F.2d 422, 426 (7th Cir.1993); *NLRB v. O'Hare–Midway Limousine Serv., Inc.,* 924 F.2d 692, 697 (7th Cir.1991); *NLRB v. Bliss & Laughlin Steel Co.,* 754 F.2d 229, 235 (7th Cir.1985).[2]

■ Union–Tribune argues that the ALJ's decision did not conform to this two-step analysis, which requires an initial finding that protected activity motivated the employer's action, and only then examines whether the employer's proffered reasons for the action were pretextual. Although the Board attempted to reconstruct the ALJ's decision, Union–Tribune contends that the original error persists. The Board considered the find-

ing of pretext to be one factor that, in addition to other factors it identified in the record, supported a determination that Union–Tribune acted with an improper motivation. According to Union–Tribune, the Board's approach still inverts the proper procedure for analyzing NLRA violations.

Whether the employer's explanation for a discharge can be assessed in judging the General Counsel's prima facie case has been the subject of some debate. In a footnote to its 1980 *Wright Line* decision, the Board stated that "[t]he absence of any legitimate basis for an action, of course, may form part of the proof of the General Counsel's case." *Wright Line,* 251 N.L.R.B. at 1088 n. 12 (citing *Shattuck Denn Mining Corp. v. NLRB,* 362 F.2d 466 (9th Cir.1966)). Despite that seemingly straightforward statement, the Board wavered for a number of years on the issue of whether the ALJ can judge the prima facie case only in light of explanations offered by the employer contemporaneously with the challenged event, or also in light of explanations offered at the administrative hearing itself. *Compare Hillside Bus Corp.,* 262 N.L.R.B. 1254 (1982) (restrictive view) *with Active Transp.,* 296 N.L.R.B. 431, 432 & n. 8 (1989), *enf'd mem.,* 924 F.2d 1057 (6th Cir.1991) (expansive view). *See generally Holo–Krome Co. v. NLRB,* 954 F.2d 108, 112–13 (2d Cir.1992) (charting the Board's inconsistent positions). More recently, the Board has authorized ALJs to judge the prima facie case on the basis of *all* record evidence. In *Greco & Haines, Inc.,* 306 N.L.R.B. No. 119 (Mar. 9, 1992), the Board announced that "a prima facie case may be established by the record as a whole and is not limited to evidence presented by the General Counsel." In that context, it reiterated *Wright Line*'s language that the absence of a legitimate basis for an action may form part of the proof of the General Counsel's case, and it explicitly men-

---

**2.** It has been noted that the Board's approach merges "dual motive analysis" and "pretext analysis," traditionally thought to be two different methods of evaluating an employer's conduct. *See Holo–Krome Co. v. NLRB,* 954 F.2d 108, 110–11 (2d Cir.1992). Use of the term "pretext" in the ALJ's and Board's decisions, therefore, is less anomalous than it may appear. *See NLRB v. So-*

*White Freight Lines, Inc.,* 969 F.2d 401, 406 (7th Cir.1992) (although the two methods are distinct, "the fact-finding methodologies of each are similar and, indeed, overlapping"); *cf. Wright Line,* 251 N.L.R.B. at 1084 n. 5 ("[T]he distinction between a pretext case and a dual motive case is sometimes difficult to discern.").

tioned the implausibility of the employer's explanations in that case as evidence that contributed to the General Counsel's proof. *See id.; see also Golden Flake Snack Foods,* 297 N.L.R.B. 594, 594 n. 2 (1990).

The Second Circuit recently published a scholarly opinion upholding the Board's new approach and concluding that it is not inconsistent with Supreme Court precedent. *See Holo–Krome,* 954 F.2d at 113. We, too, have approved reliance on an employer's implausible explanations to support the General Counsel's prima facie case, although without distinguishing between contemporaneous and ex post explanations. *See NLRB v. Industrial Erectors, Inc.,* 712 F.2d 1131, 1137 (7th Cir.1983); *NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d 613, 626–27 (7th Cir.1981). Accordingly, we endorse the ALJ's use of Union–Tribune's explanations here.

■ Union–Tribune responds that even if an ALJ may consider the employer's explanation in assessing the prima facie case, the ALJ may not rest its entire decision on that ground. We agree. It is inaccurate to state, as a general matter, that once a finding is made that an employer's proposed justification is pretextual, the analysis of the employer's motivation is at an end. *See* Brief for the NLRB at 26. A finding of pretext, standing alone, does not support a conclusion that a firing was improperly motivated. *See NLRB v. Hawkins Constr. Co.,* 857 F.2d 1224 (8th Cir.1988); *Roper Corp. v. NLRB,* 712 F.2d 306, 310–11 (7th Cir.1983). As the next section shows, however, the record in this case features other evidence of animus to supplement the finding of pretext.

### B.

■ In general, we will uphold a decision of the National Labor Relations Board if it is supported by substantial evidence. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *NLRB v. Lewis Univ.,* 765 F.2d 616, 620 (7th Cir.1985); 29 U.S.C. § 160(e) (1988). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support the Board's conclusion." *Mary Thompson Hosp. v. NLRB,* 943 F.2d 741, 745 (7th Cir.1991) (cita-

tion omitted). We will not overturn the Board's findings merely because "we find[ ] the opposite conclusion more reasonable" or "question the factual basis." *NLRB v. Advance Transp. Co.,* 965 F.2d 186, 190 (7th Cir.1992) (citation omitted).

■ Union–Tribune disputes the Board's conclusion that it fired Tetrault out of antiunion animus, and it takes issue with each of the factors identified by the Board as supporting that inference. First, it denies that there is evidence in the record for the ALJ's finding that relations between the bargaining parties had reached a forty-year low. With regard to the company supervisors' remarks to Tetrault, Union–Tribune contends that each is a legitimate statement of opinion, not a hostile expression of antiunion animus. In any case, the NLRA explicitly allows employers to express antiunion sentiment without committing an unfair labor practice so long as those statements contain "no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). Next, Union–Tribune argues that the filing of a charge or even the issuance of a complaint against an employer proves nothing about the presence of animus. Finally, it claims that there is no evidence that all the managers screened the videotape of the documentary and, even if they did, it questions the connection between that fact and the determination that they harbored antiunion animus. Union–Tribune also notes that other employees prominently featured in the documentary were not fired.

■ Our task in this proceeding is not to decide for ourselves whether we believe that union activity motivated Union–Tribune to fire Tetrault, but only to determine whether the record contains evidence that supports that view. While we would not pretend that the case against Union–Tribune is overwhelming, it is strong enough to withstand our deferential review. Admittedly, none of these factors considered individually proves the existence of an antiunion animus. In combination, however, they circumstantially support the conclusion. The record certainly indicates that tension between Union–Tribune and the Guild during the summer and fall of 1988 had reached a fervid pitch. The

comments made by company supervisors to Tetrault indicate that Union–Tribune was aware of her union involvement—indeed, of her role as a major Union–Tribune antagonist—and was not favorably disposed to it. These circumstances cast Tetrault's suspension and discharge in a somewhat suspicious light; when combined with a determination that the offered reasons for these actions were implausible, they support an inference of unlawful motivation.[3]

The bulk of the ALJ's decision is devoted to an analysis of Union–Tribune's eighty-two offered reasons for firing Tetrault. All of these reasons fell into a few repeated categories: Tetrault had submitted "cash turn-ins" for particular delivery routes that contained checks from customers on other routes; she had submitted her own personal checks to pay for several carriers' paper bills; she had permitted carriers who had not yet been contracted with the company to ride in company vans; she had permitted uncontracted carriers to collect from customers; she had submitted RPBs that had not been signed by the carriers; and she had allocated collection money to the wrong routes or too slowly. Carriers also forwarded individual complaints about Tetrault's management. In each case, the ALJ concluded that Tetrault had followed practices typical among district managers or specifically approved by her supervisors. For example, regarding the allegation that Tetrault submitted cash turn-ins with mismatched personal checks, the ALJ found this was a "common, accepted, and timesaving practice, which numerous district managers follow on a daily basis." Indeed, the Training District Manager testified that she trained new district managers to follow this procedure, since it allowed managers to compensate unpaid carriers immediately out of cash that had been collected, by substituting checks from other routes for the cash.

Union–Tribune challenges these findings, but mostly criticizes the ALJ and the Board for ignoring the evidence that it submitted on its own behalf. Union–Tribune reminds us that Tetrault herself initially requested the transfer to District 128. It also contends that the ALJ overlooked evidence of Tetrault's history of poor performance, which was chronicled in numerous negative reviews, warnings, and disciplinary measures dating back to 1986. Union–Tribune submitted evidence that it warned Tetrault in late 1987 that continued failure to meet deadlines for the RPBs would result in disciplinary action. All the same, it points out, it took measures to lessen Tetrault's burden, such as introducing advance collections, combined delivery routes, and adult carriers into her district. Even if the charges against Tetrault eventually proved unsubstantiated, Union–Tribune argues, it had at the time a good-faith belief in their validity.

The ALJ acknowledged that Tetrault had not enjoyed a stellar record as the manager of District 128, but he found that Union–Tribune bore responsibility for assigning Harms, "who was unqualified to be placed in charge of such [a] volatile district," to be her vacation relief manager, and for refusing to help Tetrault during the months immediately preceding her vacation. Even if Tetrault's performance up to the summer of 1988 *could* have justified her firing, the ALJ was not convinced that Union–Tribune was planning to take that step. On the principal issue of the mismanagement charges, the ALJ's exhaustive inquiry into the multifarious grounds offered for Tetrault's termination withstands attack. There was ample evidence that Tetrault had merely followed practices common among district managers, and that Union–Tribune should have known as much.[4] We therefore believe that the

3. The fact that Union–Tribune punished only Tetrault and no other employee involved in the cable documentary does not undercut the Board's determination that it acted out of animus. "[A] discriminatory motive, otherwise established, is not .disproved by an employer's proof that it did not weed out all union adherents." *Nachman Corp. v. NLRB,* 337 F.2d 421, 424 (7th Cir.1964) (citation omitted).

4. Nonetheless, we are troubled by the General Counsel's argument that Union–Tribune's failure to notify Tetrault of the charges against her is evidence that the investigation was conducted in bad faith. The General Counsel's brief does not even mention the Board's ruling that Union–Tribune was entitled not to disclose its reasons for discharging Tetrault, with which his argument is at least superficially inconsistent. Indeed, although the Board affirmed the ALJ's de-

ALJ's decision was supported by substantial evidence. For the same reasons, we conclude that Union–Tribune did not carry the burden of proving its affirmative defense, that it would have fired Tetrault even if no improper motivation had existed.

The Board's order is ENFORCED.

MANION, Circuit Judge, dissenting.

I do not dispute the legal boundaries of today's decision. The law is quite plain. The Board must prove that antiunion animus motivated Union–Tribune's actions against Tetrault. Nor do I disagree with the Board's new approach of looking to all record evidence in judging whether the plaintiff has made out a prima facie case. The Administrative Law Judge (ALJ) thought the case was over when he found that Union–Tribune's asserted reasons for firing Tetrault were not truthful. The court is correct in holding that alone this cannot support a finding that the company otherwise acted with antiunion animus. In the usual unfair labor dispute, we would give great deference to such a finding by the ALJ. In this case, however, we are asked to review the Board's order that created its own finding based on other evidence in the record.

The hearing before the ALJ began on September 25, 1989 and ended September 14, 1990. After nearly a year of testimony, the Board now relies on five factors in concluding that antiunion animus caused Union–Tribune to fire Tetrault. I agree with the court, *supra* page 491, that "none of these factors considered individually proves the existence of antiunion animus." I disagree, however, that together they provide circumstantial evidence of improper motive.

The court finds, *supra* page 491, that certain comments made by company supervisors to Tetrault indicate that Union–Tribune was not favorably disposed to *her* union involvement. I disagree. While Tetrault was a member of the bargaining committee, she was told that "the union shop was out and *it* would not exist at the end of negotiations." (Emphasis added). The court would have us believe that this supports a finding that the

company was telling her that *she* would be out at the end of negotiations. Such comments do not show any more than the usual confrontation between company and union officials during heated bargaining seasons. Similarly, whether the bargaining relationship of the parties was at an all-time low or whether the union had filed a bad-faith bargaining grievance against the company have little to do with why Union–Tribune would specifically target Tetrault. Only two specific factors relied upon by the Board could connect such dots.

Richard Julian told Tetrault that her decision to resign from the bargaining committee showed that she had her priorities straight. If anything this supports the company's case. She does not allege that the company in any way forced her to resign from the bargaining committee. That was her decision. And obviously District 128 was demanding. The fact that the company was pleased with her decision to devote more time to the problems of her job cannot in any way support a finding that she would later be fired for involvement in an activity she had voluntarily diminished.

Tetrault also appeared on television in a videotape documentary, critical of the company. I am at a loss as to the relevance of any implication here. Certainly Union–Tribune knew she was active in the union. Tetrault cannot have this court assume that because she chastised the company, it would naturally want to get back at her. As we are trying to determine the Union–Tribune's motive, its only action here was watching the broadcast. The company cannot be faulted for keeping abreast of its public exposure.

Union–Tribune did not act out of antiunion animus in firing Tetrault. Because the ALJ failed to make such a finding, and no other evidence supports such a view, I respectfully dissent.

cision, it did so subject to several modifications    of which that ruling was one.