NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TRANSCON LINES, Respondent.

No. 78–2434.

United States Court of Appeals,
Fifth Circuit.

July 30, 1979.

Rehearing Denied Aug. 29, 1979.

Elliott Moore, Deputy Associate Gen. Counsel, Charles P. Donnelly, Howard E. Perlstein, N.L.R.B., Washington, D. C., for petitioner.

Vial, Hamilton, Koch, Tubb, Knox & Stradley, James H. Baumgartner, Jr., Dallas, Tex., for respondent.

Before GODBOLD, Circuit Judge, SKELTON,* Senior Judge, and RUBIN, Circuit Judge.

GODBOLD, Circuit Judge:

The employer Transcon is a California corporation engaged in handling, hauling and storing interstate freight by truck. It maintains terminals at Dallas, Texas, and elsewhere. It is a party to the National Master Freight agreement with the Teamsters. In the Dallas area approximately 240 Transcon drivers are represented by the Teamsters.

The Board found [1] that Transcon violated § 8(a)(1) of the National Labor Relations Act [2] by prohibiting employee Archie Brown, an over-the-road driver employed at the Dallas terminal, from distributing literature expressing opposition to the Teamsters. Brown was a member of the Teamsters and also of a dissident group within the union. Between around January 1, 1977, and the summer of 1977, he distributed leaflets criticizing officers and policies of the union. Most of the distribution was made in the "drivers' room" maintained by the company at the Dallas terminal, although there is evidence of some distributions at Dallas other than in the drivers' room and of some distributions at other terminals. In the "drivers' room" Brown handed copies of his leaflets to other drivers, left them on tables, and posted them on a bulletin board.

The drivers' room is adjacent to and separated by glass partitions from the dispatcher's office. Prior to a trip, drivers receive a two-hour notice, come to the terminal, punch in on the time clock in the drivers' room, receive dispatch forms from the dis-

patcher, pick up and complete necessary trip documents, and read company notices. Each may wait there for the driver he will share his trip with. On their return from trips, drivers go in the drivers' room, complete travel documents and reports, and wait for transportation home.

The drivers' room has three bulletin boards, one for union materials, one for company bulletins, and one for miscellaneous personal notices (advertising, charitable solicitations, religious tracts). It contains coffee and soft drink machines, a candy machine, a table, a stand-up counter, and a time clock. Company materials, religious materials and forms distributed by the union are often found on the table. Drivers post bulletins about items for sale or exchange. They relax in the room, drink coffee, eat candy, "hang around," and discuss nonwork related topics. No other space is provided for drivers to relax on breaks.

In January and February Brown distributed leaflets urging members not to join the Teamsters' political action arm and instead to join the dissident group to which he belonged. He intimated that union officers were "Mafia Types, Filth, Scum . . . Underworld Figures." In a leaflet distributed in March, Brown protested his treatment at a union meeting and objected to the use of epithets (racial and otherwise) at the meeting. As we shall discuss later, distribution of this March leaflet was interfered with by the employer.

Later, presumably in March or April, someone posted anti-Brown materials that, among other things, called him a communist. Brown responded in April with a leaflet attacking local union officers by name. In May he distributed information on union officers' compensation, solicited support for a candidate in an upcoming union election, and proposed that other persons challenge incumbent officers. In either July or September Brown distributed a letter describing grievances he had filed.

* Senior Judge of the United States Court of Claims, sitting by designation.

1. Reported at 235 NLRB No. 161.

2. 29 U.S.C. § 151 et seq.

Employer interference with Brown's anti-Teamsters campaign took three forms. In March Transcon's superintendent of transportation Zinck removed Brown's March leaflets from the drivers' room. He told Brown: "No more. I've had it, this is it. You are causing friction here, and I've got a company to run." At another time, not specified, terminal manager Shaw told Brown that Brown knew he was not supposed to put such material [the anti-Teamsters leaflets] out and that Shaw did not want any of it on the dock or parking lot.[3]

We do not need to decide whether these occurrences rise to the level of a rule or policy (bearing in mind that most of Brown's broadsides were not actually interfered with and only one, the March leaflet, was removed). Superintendent of transportation Zinck testified that there was a general company policy not to allow materials, such as Brown's and the anti-Brown material, to be posted because of the dissension it caused. He gave as the reason for this policy the fear that such distributions would distract drivers and interfere with their ability to safely handle equipment. This settles the "rule or policy" matter.

■ We think the Board correctly held that, apart from the place of distribution, the material involved was protected.

Section 7 of the Act guarantees employees the right to engage in concerted activities, not only for self-organization, but also for "mutual aid or protection." This statutory protection extends to efforts by employees "to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employer-employee relationship."

*Eastex, Inc. v. NLRB*, 437 U.S. 556, 564, 98 S.Ct. 2505, 2511, 2517, 57 L.Ed.2d 428, 438 (1978). Attempts by employees to bring about changes in their union's performance as their collective bargaining representative are "certainly 'concerted activity' protected by Section 8(a)(1) of the Act." *N. L. R. B. v. Nu-Car Carriers, Inc.*, 189 F.2d 756, 760 (C.A. 3, 1951), *cert. denied*, 342 U.S. 919, 72

S.Ct. 367, 96 L.Ed. 687. *And see Eastex, Inc. v. N. L. R. B. supra*, 98 S.Ct. at 2517, n.23 (protection "encompass[es] non-organizational literature complaining about an incumbent union's leadership or bargaining position"). *Accord, N. L. R. B. v. Mid-States Metal Products, Inc.*, 403 F.2d 702, 706 (C.A. 5, 1968) (anti-union distributions, protected); *Samsonite Corp.*, 206 NLRB 343, 346 (1973); *The Singer Company*, 220 NLRB 1179, 1180 (1975) (distribution of dissident publications which "sought to spur the union to more effective representation," protected).

■ Next we consider the time and place of distribution. An employer may lawfully prohibit his employees from distributing literature concerning their working conditions in work areas or during work time. But a rule that extends the prohibition to non-working areas during non-work time is presumptively invalid unless the employer shows that a ban is necessary to maintain plant discipline or production. *Eastex*, 437 U.S. at 570, 98 S.Ct. at 2515, 57 L.Ed.2d at 442. The Board correctly found that the employer did not sustain this burden of proof. It held:

> I must conclude that the drivers' room is, at best, a mixed use area, where drivers may both work or relax. It is also the only area where drivers can regularly communicate with one another on subjects of mutual concern, a fact recognized by Respondent when it permits all parties to campaign there prior to union elections.

This is supported by substantial evidence.

The employer urges that the Board's proof failed because it was not shown that at the moment Brown handed out literature to other drivers (or placed it in the drivers' room) he was on non-work time, and that at the precise moment each other driver was handed a piece of literature in the drivers' room, he was in non-work status as well. We have described the "mixed" nature of the drivers' room as a place for lounging, recreation and waiting, as well as a place to

---

**3.** The Board credited Brown's testimony as to this occurrence. Shaw did not testify.

receive dispatches and complete documents. The employer's argument is specious with respect to Brown, who, like other drivers, was free to wait and relax in the drivers' room if not engaged in filling out documents. With respect to drivers who were handed pieces of literature, the precise nicety of proof hypothesized by the employer was not required. The room contained a bulletin board provided for posting of union materials. The employer permitted the room to be used for solicitation at union election time. A policy of permitting pro-union literature and activities in the room without regard to the niceties of whether the recipient is relaxing or filling out a form, while insisting upon such nicety if a dissident's literature is involved, would fall as discriminatory.

A Board order is justified. The order entered was, however, overbroad. The employer properly complains that the Board zeroed in on the distributions in the drivers' room and it carved out of the case evidence, albeit thin, that Brown had made distributions at other terminals of Transcon. The Board employed the evidence of manager Shaw's having told Brown that he should not put out material on the dock or parking lot as tending to show a policy of forbidding distribution. Presumably the dock was a work area, but the Board did not consider this. Possibly the parking lot was also—we do not know whether it was for parking employees' cars or Transcon's rigs. Having itself defined the case as involving distributions in the drivers' room and having pre-termitted both facts and law concerning distributions elsewhere, the Board has then swept in distributions generally by the scope of a plenary order against any interference with employee distributions. So far as the record shows, distributions made by Brown elsewhere than in the drivers' room at Dallas may have been made in places and under conditions that, if repeated, the employer would be entitled to limit them but for the order we are asked to enforce.

■■ We recognize the remedial power of the Board to further the purposes of the Act by barring practices factually broader

in scope than those found in the case to have occurred. But employer restraints on distribution of literature are not fungible. The validity of a restraint, and the legal standards for measuring its validity, depend upon where the distribution is made and what the circumstances are. To narrow the case for decision purposes, as the Board did, and then to broaden it to the widest possible limits for purposes of remedy, so as to sweep in restraints that may be unobjectionable, cannot be sustained.

The Board should submit to this court within 30 days a properly narrowed order.