REVISED, April 6, 2001

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 99-60439

VALMONT INDUSTRIES, INC.,

Petitioner-Cross-Respondent,

VERSUS

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner.

Petition for Review and Cross-Petition for Enforcement
of an Order of the National Labor Relations Board

March 12, 2001

Before WIENER and STEWART, Circuit Judge and ROSENTHAL, District Judge.[*]

ROSENTHAL, District Judge:

Valmont Industries, Inc. petitions for review of the National Labor Relations Board's Decision and Order finding unfair labor practices. The Board cross-petitions for enforcement of its Order. The Board's Order affirmed the decision of an administrative law judge that Valmont violated sections 8(a)(1) and (a)(3) of the

---

[*]     District Judge for the Southern District of Texas, sitting by designation.

National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (a)(3), by giving two employees written warnings motivated by antiunion animus; discharging one of those employees and issuing a written warning to another for asking a coworker if he had signed a union card, in violation of the company's no-solicitation policy; and orally warning a fourth employee for distributing union literature, also in violation of the no-solicitation policy.[1]  One member of the Board dissented in part, finding insufficient evidence that the first two warnings were motivated by antiunion animus and concluding that because the discharged employee had violated a valid no-solicitation rule, he was properly fired.

This court has carefully reviewed the record as a whole.  See Asarco, Inc. v. NLRB, 86 F.3d 1401 (5th Cir. 1996).  Based on the facts disclosed in the record, and on the deferential review the law requires this court to apply, this court grants enforcement as to part of the Board's Order and denies it in part.  Specifically, we conclude that the record provides substantial evidence that Valmont violated sections 8(a)(3) and (a)(1) by issuing a written warning to the employee who asked her coworker if he had signed a union card and violated section 8(a)(1) by issuing an oral warning to the employee who distributed leaflets.  We also conclude that substantial evidence supports the finding that Valmont violated

_____

[1]    The ALJ also considered a charge that Valmont engaged in impermissible surveillance on August 20, 1997.  After the hearing, General Counsel for the NLRB conceded that the case for surveillance was not made.  The ALJ dismissed that charge.

2

section 8(a)(1) by firing the employee for violating the no-solicitation rule.  We grant enforcement of the Board's Order with respect to these findings.  However, we do not find that substantial evidence supports the finding that Valmont violated sections 8(a)(3) and (a)(1) by issuing the first two written warnings.  Nor do we find substantial evidence to support the finding that the firing or the oral warning violated section 8(a)(3).  We deny enforcement of the Board's Order with respect to these findings and remand to the Board to modify its Order in conformity with this opinion.

## I. Background

Petitioner, Valmont Industries, Inc., manufactures steel poles at a plant in Brenham, Texas.  The United Steelworkers of America, AFL-CIO, CLC (the "Union") supervised an unsuccessful organizational campaign among Valmont's employees, ultimately losing an NLRB-conducted election in September 1996.

After this campaign, and in part because of it, Valmont instituted a no-solicitation rule.  That rule provided:

> Distribution of literature during the working time of any employee involved is prohibited. Working time does not include breaks or meal times.  Distribution of literature is also prohibited in working areas.

> Solicitation by employees on their working time or on the working time of any employee solicited is prohibited.

The parties agree that the no-solicitation policy is facially valid.

In late July 1997, the union began a second effort to organize Valmont's employees. The disciplinary actions at issue in this suit issued shortly after the start of this second organizational campaign.

## A.    Valmont's Warning of Lewis and Sharp

On Monday, July 28, 1997, Michael Sharp, an employee in the shipping department, took a malfunctioning machine to the plant's maintenance shop for repair. The maintenance shop is at the end of a building that also contains the large pole and small pole manufacturing departments. Sharp went first to the maintenance shop, then to the large pole department, where Edgar Lewis worked. Sharp found Lewis and they had a brief conversation. It is undisputed that Sharp's ordinary work duties would not take him to Lewis's department or work station.

Sharp later explained that when he discovered he did not have a pen needed to complete a maintenance request form, he went to find his friend Lewis to borrow one. Lewis walked to his nearby locker to find a pen. Sharp testified that he filled out the maintenance request form, entering the time as "8 a.m.," and including the date and his signature, and went back to the maintenance shop. Lewis and Sharp both testified that their conversation lasted less than two minutes and consisted of Sharp

4

asking for, receiving, and returning a pen to complete the maintenance form.

Foreman Sam Gregg and leadman Billy Dotson observed the conversation between Lewis and Sharp. In their later testimony before the ALJ, both denied having seen Lewis hand Sharp a pen or any other item. Dotson and Gregg testified that the conversation between Lewis and Sharp lasted between three and five minutes. As they watched the conversation, Gregg commented to Dotson "[a]bout what [they] were seeing . . . about [Lewis] and [] Sharp's being together." Gregg privately speculated that the two were talking about the union. Valmont management and supervisors knew that Lewis, and, to a lesser extent, Sharp, had been active in the 1996 organizational campaign. Neither Gregg nor Dotson was able to hear what Lewis and Sharp said.

Later that day, Gregg reported to Allen Abney, the manufacturing manager, that he had seen Lewis and Sharp talk for "a few minutes" and that they stopped talking when they noticed Gregg and Dotson watching. Gregg did not mention his speculation that Lewis and Sharp were talking about union activities.

The second union organizational campaign began on Thursday, July 31, three days after Lewis and Sharp had their brief conversation. The campaign began with the union's distribution of cards to members of an in-plant organizing committee, including Edgar Lewis. The committee members were to obtain signatures on the cards and return them to union officials. Lewis took part in

5

visiting employees at their homes in early August to talk to them about the organizational campaign.  There is no evidence in the record that Valmont management knew of these visits.  The record discloses that union supporters began distributing leaflets in the plant beginning on approximately August 10 and that leafleting at the plant entrance began on August 19.

On August 1, Lewis received a final written "corrective action" for "wasting company time."  The written warning, read by Abney in a meeting attended by Gregg, Dotson, and the human resources manager, Roger Bower, identified the date of violation as the week of July 28 and described the violation as follows:

> Edgar Lewis has been observed numerous times wasting company time by not returning from break on time, talking to other employees at his work station during working time, leaving his assigning [sic] work station and distracting other employees while they are working.  We counseled with Edgar on 11-27-96 regarding this unexceptable [sic] behavior. This behavior is a violation of company policy which states that "intentional waste of time, loitering, or leaving an assigned work area during work hours without authorization", is not permitted. It is important that Edgar understands [sic] that waste of company time will not be tolerated and any other violation of company policy will result in further corrective action up to and including termination from employment. <u>This is a final notice.</u>

Lewis asked why he was receiving a final written warning when he had received no written warning in the previous six months. Valmont's written progressive discipline policy provides for discussion, a documented verbal reprimand, a written reprimand,

6

final notice, then termination. Abney responded that the discipline was for a repetition of the conduct that had led to the final written warning Lewis received in November 1996. Lewis pointed out that under Valmont's policy, the six-month probation period after a final warning had elapsed two months earlier. Lewis asked how he could be accused of "loafing" when his production level was higher than that of the majority of employees in similar positions. Abney did not respond, other than by stating that Lewis had been seen leaving his work station to talk to other employees and talking to employees who visited his work station.

In the hearing before the ALJ, Abney testified that Gregg's oral report that Lewis and Sharp had talked for a few minutes on July 28 formed the basis for the final written corrective action issued to Lewis on August 1, 1997. Abney testified that during the August 1 meeting, Lewis admitted to his July 28 conversation with Sharp. Lewis disputed this testimony, asserting that neither Sharp's name nor a specific conversation was mentioned during the August 1 meeting. The written corrective action form does not refer to a conversation with Sharp. The ALJ credited Lewis's version of the meeting and found that Abney did not refer to Sharp or the July 28 conversation at Lewis's workstation in explaining why Lewis had received the final written warning.

Abney testified that he and Bower decided to give Lewis a written final warning on August 1, 1997, because Abney had orally counseled Lewis about "disrupting employees while they [were]

working and soliciting" in April or May 1997. The ALJ noted that the written corrective action form did not mention oral warnings issued to Lewis in April or May 1997 and found that Abney and Bower did not refer to prior oral counseling when they gave Lewis the form in the August 1 meeting. Lewis testified that he had received no discipline since the November 27, 1996 written warning. The ALJ accepted Lewis's version as credible. However, the ALJ's treatment of the testimony relating to the prior oral counseling is inconsistent, as explained more fully below.

On August 5, 1997, Sharp also received a warning in the form of a written corrective action. The warning accused Sharp of "loafing" by leaving his assigned workstation. Sharp asked Bower for the name of his accuser; Bower did not respond. Sharp told Bower that he thought that the source was Dotson, who Sharp remembered seeing when he went to borrow Lewis's pen to fill out the maintenance request form. Sharp explained the reason he had gone to Lewis's workstation and told Bower to check with Sharp's leadman and to pull the maintenance request form itself for corroboration. Bower proceeded to issue Sharp the written warning.

Later that day, Bower reviewed the maintenance request form that Sharp had completed on July 28. Bower noted the time Sharp wrote on the form, 8:00 a.m. The following day, August 6, Abney asked Gregg to provide a written statement of his observations of the July 28 exchange between Sharp and Lewis. Gregg did so. He testified that Abney also asked Dotson to provide a written

8

statement on August 6. Dotson testified inconsistently that he had already prepared a written statement on his own initiative on the date of the incident, July 28. The ALJ found that Dotson's testimony that he had prepared his statement on the day he saw Lewis and Sharp talking was not credible.

In their written statements, both Dotson and Gregg placed the time of the conversation they observed at 8:15 a.m., after Sharp had filled in the maintenance form. However, in their testimony before the ALJ, neither Gregg nor Dotson could recall the time of the conversation between Lewis and Sharp. Gregg and Dotson both testified that they did not look at their watches or a clock and had no way to determine the time or length of the conversation they reported. Their testimony was inconsistent with their written statements, which did state the time and length of the conversation they had witnessed. Both their testimony and written statements varied from Lewis's and Sharp's consistent accounts that they talked for less than two minutes, before Sharp submitted the maintenance request form at 8:00 a.m., and about finding a pen to complete that form. The ALJ found Gregg and Dotson to lack credibility and gave "no weight" to the time recorded in Dotson's and Gregg's written statements.

The ALJ credited Lewis's and Sharp's account of their July 28 conversation, finding that they talked for one to two minutes about Sharp's need for a pen to complete the maintenance request form, a work-related topic. It is undisputed that engaging in a work-

9

related conversation on working time is not a valid basis for discipline at Valmont.

**B.    Valmont's Discharge of Lewis and Warning of Fontenot**

On August 19, 1997, shortly after the distribution of union literature at the plant had begun, Valmont suspended Lewis's employment and issued a warning to another employee, Laura Fontenot.  A few days after Lewis's suspension, Valmont terminated his employment.  Lewis was suspended, then fired, and Fontenot was warned, for violating Valmont's rule against solicitation on "working time."  Valmont alleged that Lewis and Fontenot had each asked Lonny Hutchison, a leadman, if he had signed a union card.  Many of the facts leading to the discipline were vigorously disputed before the ALJ.  The ALJ credited Lewis's and Fontenot's accounts and rejected the contradictory testimony Hutchison provided.

In their testimony before the ALJ, Lewis and Hutchison disputed where their conversation took place, when it took place, and whether Hutchison was working when he and Lewis talked.  Lewis testified that on August 12, 1997, he began his break at 1:30 p.m., when a signal sounded the start of the shift-wide break for the day shift workers.  As Lewis left the restroom, he ran into Hutchison in an aisle between production areas, as Hutchison was leaving the break room.

10

Lewis had previously given Hutchison a union card, at Hutchison's request. When Lewis encountered Hutchison, Lewis said, "I guess you decided not to sign a card." Hutchison replied that he had not yet made up his mind. Lewis asked Hutchison to let him know when Hutchison did decide; Hutchison said he would. The two men walked off in opposite directions. Lewis testified that because the shift-wide break had begun, he could ask about the union card without violating the rule against soliciting during working time.

In one of two written statements Hutchison provided to Abney, Hutchison stated that Lewis had stopped him as Hutchison reached the press in the small pole department and asked him if he had signed a union card. In his first written statement, Hutchison wrote, "To my knowledge, this took place after break, but I am not certain." In a second written statement, Hutchison stated that his conversation with Lewis occurred at approximately 1:35 p.m., which was during the official shift-wide break. In his second statement, Hutchison stated that Lewis had stopped him after Hutchison left the break room in the area of the small pole press.

In his testimony before the ALJ, Hutchison contradicted his already inconsistent written statements. He admitted that his conversation with Lewis occurred during the regularly scheduled shift-wide break, as Lewis had described. He also admitted that the conversation occurred in the aisle near the restroom, as Lewis had stated.

11

Hutchison did consistently maintain that he was not on break himself when he and Lewis had their brief exchange. Hutchison, ordinarily a day-shift worker, was working an extended evening shift, beginning at 1:00 p.m. and continuing to 11:00 p.m. Under Valmont policy, an employee's first break occurs two hours into a shift. On that date, Hutchison's first break was not until 3:00 p.m.; he did not join the day-shift break period at 1:30 p.m. However, at 1:30 p.m., Hutchison had gone to the break room to look for another employee, who was on break. Hutchison had just walked out of the break room when he encountered Lewis in the aisle.

On August 12, Hutchison also talked to Laura Fontenot, a saw operator. The discussion began with Fontenot questioning Hutchison about disposing of some scrap metal, then proceeded to an exchange about signing a union card. Fontenot and Hutchison gave different accounts of their discussion about the union card in their testimony before the ALJ.

Hutchison asserted that Fontenot told him that she had used the scrap metal as a pretext for coming to Hutchison's work area for the specific purpose of asking him to sign a union card. Hutchison accused Fontenot of asking him to pretend that she was authorized to be in his work area. In his first written statement, Hutchison stated that the conversation occurred on August 15, at 2:45 p.m., which would have been before the horn sounded to signal ten minutes left on the shift. In a second written statement, Hutchison dated the conversation as taking place on August 12. In

12

the written statements, Hutchison stated that when Fontenot asked Hutchison if he had signed a union card, Hutchison said that he would not. Fontenot asked why he had not signed a card; Hutchison responded that Valmont did not need a union. Fontenot told Hutchison that he could sign a union card and still vote against the union in the election.

Fontenot disputed Hutchison's account. Fontenot consistently told her management and the ALJ that on August 11, Fontenot's leadman instructed Fontenot to ask Hutchison to take care of some scrap metal. On August 12, after the horn sounded signaling ten minutes remaining in the shift, Fontenot confirmed with her leadman that he wanted her to have Hutchison take care of the scrap metal. Fontenot then went to the small pole department to talk to Hutchison. They talked about the scrap metal as they walked toward the aisle in the small pole department. Hutchison agreed to handle the scrap metal. At the aisle, Fontenot asked Hutchison if he had signed a union card. When Hutchison said he had not, Fontenot said, "great," and continued toward the timeclock area to clock out.

A few days later, Hutchison reported his conversations with Lewis and Fontenot to Abney, complaining about disruption to himself and other employees. Based on Hutchison's report, Abney decided to discipline both Lewis and Fontenot for violating Valmont's no-solicitation policy.

13

On August 19, Lewis met with Gregg, his foreman, as well as Abney and Bower. Bower told Lewis that he had been seen leaving his work station to solicit for the union between 1:30 p.m. and 2:00 p.m. on August 12. Lewis denied the accusation. Bower told Lewis that he was on indefinite layoff pending investigation. Lewis asked who had seen him soliciting, but received no response.

On August 22, Lewis was called to the plant, where he met with Abney and Bower. Bower read from a written corrective action form, stating that on August 12, at around 1:30 p.m., Lewis had entered the small pole production area and engaged in a nonwork-related conversation with another employee while that employee was on working time. Lewis again denied the accusation. Lewis asked the source; Abney declined to provide it, stating that he had to protect the identity of the person. Lewis pointed out that 1:30 p.m., the time stated in the corrective action, was in fact break time. Abney responded that even if Lewis was on break, he had been in a work area at the time of the conversation. Abney's response reflected his misunderstanding of the no-solicitation policy as prohibiting oral solicitation outside the break room, restrooms, or lunch room, at any time. It is undisputed that the no-solicitation policy did not impose such a broad prohibition.

On August 19, Bower and Abney issued Fontenot a written corrective action form, stating that Fontenot had left her work station and solicited an employee during working hours and in a working area, and had misrepresented where she was going and why.

14

Fontenot explained that her leadman had assigned her the task of talking to Hutchison about the scrap metal. She denied that she had solicited anyone, insisting that she had merely asked Hutchison whether he had signed the union card at the end of their work-related conversation. Fontenot also pointed out that she did not even go to Hutchison's work area until after the ten-minute horn sounded. Fontenot gave consistent testimony before the ALJ.

The ALJ credited the testimony Lewis and Fontenot provided and found Hutchison to lack credibility. The ALJ specifically found that Lewis and Hutchison had their brief exchange in the aisle, near the restroom, while Lewis was on break, just after Hutchison had exited the break room. The ALJ concluded that although Hutchison may not have regarded himself as on break, he was not working. Instead, he was "wandering around the plant looking for a coworker who was on break." The credited evidence led the ALJ to conclude that Lewis did not violate the no-solicitation rule, because that rule permits oral solicitation on nonworking time, even in a work area. The ALJ emphasized that Valmont supervisors consistently misunderstood the rule to prohibit solicitation in working areas, even on nonworking time.

As to Fontenot, the ALJ noted the discrepancy between Hutchison's various statements regarding the date of his conversation with Fontenot. The ALJ also rejected Hutchison's contention that Fontenot had contrived a pretext for coming to his work area. The ALJ found that Fontenot only asked Hutchison if he

15

had signed a union card and neither asked him to sign a card nor told him that he could sign a union card and later vote against the union. Based on the credited testimony, the ALJ found that Fontenot did not misrepresent her purpose or engage in solicitation.

### C. The Warning of Niemeyer

Grady Niemeyer worked the night shift at Valmont. At 7:00 a.m. on August 19, 1997, when the night shift ended, Niemeyer went outside the building and began distributing union leaflets to employees as they left. After all the employees appeared to have left, Niemeyer reentered the building to retrieve an item he had forgotten. When he went back into the building, Niemeyer saw another employee standing inside the entryway, in an area where the timeclock, a bulletin board, and a vending machine were located. Niemeyer handed the employee a leaflet. That employee had already begun his shift.

Foreman Sam Forman observed the incident from his seat at a desk in the entryway, near the timeclock. Forman told Niemeyer that he had violated the no-solicitation rule prohibition against distributing literature in work areas. Forman said that "anywhere inside the building [wa]s a work area." Niemeyer responded that he did not know that he was doing anything wrong and would only distribute literature outside the building in the future.

On August 22, 1997, Niemeyer received an oral corrective action for distributing literature in a work area. Niemeyer

16

challenges whether the entry area was a work area for the purpose of the no-solicitation rule.

## II. THE NLRA AND THE STANDARD OF REVIEW

Section 7 of the National Labor Relations Act guarantees an employee the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) protects the employee's right to engage in concerted activities by making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 7]." Section 8(a)(3) provides that "[i]t shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. §§ 158(a)(1) and (3).

An employer violates sections 8(a)(1) and 8(a)(3) by disciplining or discharging an employee because of his union activity. See NLRB v. Adco Electric, Inc., 6 F.3d 1110 (5th Cir. 1993); Huck Mfg. Co. v. NLRB, 693 F.2d 1176, 1183 (5th Cir. 1982). However, an employer's action that violates section 8(a)(1) does not necessarily violate section 8(a)(3). A section 8(a)(1) violation does not require a showing of antiunion animus; a section 8(a)(3) violation does. Compare Mobil Exploration & Producing U.S., Inc. v. NLRB, 200 F.3d 230, 237 (5th Cir. 1999) (employer's

conduct, rather than motive, is controlling in determination of section 8(a)(1) violation) with Asarco, 86 F.3d at 1408 (finding of antiunion animus necessary to finding of section 8(a)(3) violation).

Under section 8(a)(3), "[t]he NLRB must establish a prima facie case by proving that union animus was a motivating factor in the employer's decision to [discipline] the employee." Asarco v. NLRB, 86 F.3d 1401, 1408 (5th Cir. 1996). "Generally, an employer violates § 8(a)(3) only if its actions are motivated by anti-union animus." Goldtex Inc. v. NLRB, 14 F.3d 1008, 1011 (4th Cir. 1994). "Unwise and even unfair decisions to discharge employees do not constitute unfair labor practices unless they are carried out with the intent of discouraging participation in union activities. Accordingly, determining whether the employer's actions were motivated by anti-union animus is necessarily the crucial first step in a § 8(a)(3) case." Id.; see also Carleton College v. NLRB, 230 F.3d 1075 (8th Cir. 2000); USF Red Star, Inc. v. NLRB, 230 F.3d 102 (4th Cir. 2000).

A reviewing court will uphold the Board's decision if it is reasonable and supported by substantial evidence on the record considered as a whole. See Mobil Exploration, 200 F.3d at 237; NLRB v. Thermon Heat Tracing Serv., Inc., 143 F.3d 181, 185 (5th Cir. 1998). Substantial evidence is "such relevant evidence that a reasonable mind would accept to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); see also Thermon

18

<u>Heat</u>, 143 F.3d at 185.  Under the substantial evidence standard of review, "the ALJ's decision must be upheld if a reasonable person could have found what the ALJ found, even if the appellate court might have reached a different conclusion had the matter been presented to it in the first instance." <u>Standard Fittings Co. v. NLRB</u>, 845 F.2d 1311, 1314 (5th Cir. 1988). The standard of review of the Board's findings of fact and application of the law is deferential, as both parties recognize.  "Recognizing the Board's expertise in labor law, [the court] will defer to plausible inferences it draws from the evidence, even if we might reach a contrary result were we deciding the case <u>de novo</u>."  <u>Thermon Heat</u>, 143 F.3d at 185.

This court is bound by the credibility choices of the ALJ, unless: (1) the choice is unreasonable; (2) the choice contradicts other findings of fact; (3) the choice is based on inadequate reasons or no reasons; or (4) the ALJ failed to justify the choice. <u>See</u> <u>Asarco</u>, 86 F.3d at 1406.  Absent extraordinary circumstances, a reviewing court does not substitute its view of credibility for that of the ALJ or weigh the credibility of one witness against another and search for contradictory inferences.  <u>Id.</u>; <u>see also</u> <u>USF Red Star</u>, 230 F.3d at 107; <u>Albertson's, Inc. v. NLRB</u>, 161 F.3d 1231, 1236 (10th Cir. 1998).  This court will also "defer to plausible inferences [the ALJ] drew from the evidence, even though we might reach a contrary result were we deciding this case <u>de novo</u>." <u>Blue Circle Cement Co., Inc. v. NLRB,</u> 41 F.3d 203, 206 (5th

19

Cir. 1994) (internal quotation omitted).  The Board's conclusions of law are also entitled to deference if they have a reasonable basis in the law and are not inconsistent with the Act.  See NLRB v. Yeshiva Univ., 444 U.S. 672, 691 (1980).

In this case, the NLRB adopted the ALJ's findings that Valmont violated the Act by issuing written corrective actions to Lewis and Sharp based on their prior support for the union and Valmont's belief that they were talking about the union during work time; by discharging Lewis for soliciting Hutchison; by issuing a written corrective action to Fontenot for asking Hutchison if he had signed a union card; and by issuing an oral corrective action to Niemeyer for distributing union literature in a nonworking area. The ALJ and the Board found a section 8(a)(3) violation and a derivative, but not an independent, section 8(a)(1) violation, in Valmont's warnings to Lewis and Sharp.  The ALJ and the Board found a violation of both section 8(a)(1) and section 8(a)(3) as to the firing of Lewis and the warnings issued to Fontenot, Lewis, Sharp and Niemeyer.

### III. Discussion

#### A.  The Written Warnings Issued to Lewis and Sharp

The ALJ based his finding that the written warnings to Lewis and Sharp violated section 8(a)(3) and, derivatively, section 8(a)(1), on circumstantial evidence that Valmont disciplined Lewis and Sharp because of their known previous support for the union and

20

the belief that they were talking about the union on July 28. The ALJ specifically relied on three categories of circumstantial evidence: 1) evidence showing that Valmont gave inconsistent reasons for issuing the warning to Lewis; 2) evidence showing that Valmont failed to conduct a meaningful investigation before issuing the warnings; and 3) evidence that the warnings were more severe discipline than Valmont had issued to other employees for conduct similar to the alleged offenses. The issue is whether substantial evidence from the record as a whole supports the finding that Valmont was motivated by antiunion animus.

In analyzing the alleged section 8(a)(3) violation, the ALJ applied the burden-shifting analysis set out in Wright Line, 251 N.L.R.B. 1083 (1980), enf'd. 662 F.2d 899 (1st Cir. 1981). The General Counsel of the NLRB must prove, by a preponderance of the evidence, that antiunion animus was a substantial factor in the employer's decision to discipline the employee.[2] See Thermon Heat, 143 F.3d at 186; Asarco, 86 F.3d at 1408; NLRB v. Mini-Togs, Inc.,

---

[2] Several courts have suggested that the term "prima facie case" is inappropriate in this context. We agree. The term "prima facie case" is more often used for the allocation of burdens of proof in Title VII cases. However, the General Counsel's burden is not the same as that of the plaintiff in a Title VII case. The General Counsel must do more than simply support an inference that protected conduct is a motivating factor in the employer's decision. The General Counsel's burden is to persuade the Board that the employer acted out of antiunion animus. "Because of the continuing confusion surrounding the nature of the General Counsel's burden, we agree with those courts who have suggested that the Board no longer use the term 'prima facie case,' in the Wright Line context." NLRB v. CWI of Maryland, Inc., 127 F.3d 319, 330 n.7 (4th Cir. 1997)(collecting cases).

21

980 F.3d 1027, 1032–33 (5th Cir. 1993). Once the General Counsel makes the required showing, the burden shifts to the employer to prove by a preponderance of the evidence that it would have discharged or disciplined the employee even if the employee had not engaged in union activity. See Thermon Heat, 143 F.3d at 186; Asarco, 86 F.3d at 1408. Put another way, if the General Counsel proves that antiunion animus was a "motivating factor" in an employer's decision to discharge or discipline an employee, the burden shifts to the employer to prove that the employee would have been disciplined in any event, for a valid reason.

"Overt direct evidence of an unlawful motive is not a prerequisite to a finding that disciplinary action resulted therefrom." See NLRB v. Esco Elevators, Inc., 736 F.2d 295, 300 (5th Cir. 1984). Circumstantial evidence of discriminatory animus may be sufficient. See id. Courts have found a variety of factors to be probative of antiunion animus in employee discipline cases, including: the timing of the employer's action in relationship to union activity, see Adco, 6 F.3d 1110; Jet Star, Inc. v. NLRB, 209 F.3d 671, 676-77 (7th Cir. 2000); Cumberland Farms, Inc. v. NLRB, 984 F.2d 556, 560 (1st Cir. 1993); the presence of other unfair labor practices, see NLRB v. Advance Transportation Co., 976 F.2d 569; the failure to investigate the conduct alleged as the basis for the discipline, see Esco Elevators, 736 F.2d at 299 n.5; disparate treatment of the disciplined employee or discipline that deviates from the employer's past disciplinary practice, see

22

Marshall Durbin Poultry Co. v. NLRB, 39 F.3d 1312, 1321 (5th Cir. 1994); the implausibility of the employer's explanation of its action, see id.; Union-Tribune Publishing Co. v. NLRB, 1 F.3d 486 (7th Cir. 1993); inconsistencies between the employer's proffered reason for the discipline and other actions of that employer, NLRB v. General Fabrications Corp., 222 F.3d 218, 226 (6th Cir. 2000); and the seriousness of the alleged violation, see Presbyterian/St. Luke's Medical Center v. NLRB, 723 F.2d 1468, 1478 (10th Cir. 1983).

This case presented no direct evidence of antiunion animus. There is no history of antiunion statements or a background of ongoing union hostility. The strongest form of circumstantial evidence, proximity in time between union activity and employee discipline, is missing. The union election ended in September 1996, ten months earlier. The ALJ noted the absence of evidence that on August 1, the date of Lewis's discipline, or on August 5, the date of Sharp's discipline, Valmont knew that the union had begun a second organizational effort in which Lewis and Sharp were involved.

The ALJ noted that the timing of the warnings in relation to the beginning of the union's second campaign was "suspicious." However, the ALJ did not rely on this proximity in time as any evidence of antiunion discrimination. The record supports this approach. The record evidence showed that the first in-plant evidence of a new union organizational effort appeared on

23

approximately August 10, several days after Valmont issued the warnings. There is no other evidence that Valmont knew of the second organizational effort before then.

Noting the lack of evidence that Valmont knew of the resumption of union activity on August 1, the ALJ relied on the evidence that in April or May 1997, months after the 1996 election had ended, Abney had orally counseled Lewis against soliciting his coworkers, to prove that Valmont management believed that Lewis and Sharp were talking about the union on July 28. However, the ALJ rejected this same evidence when Valmont offered it to show a good faith belief that Lewis was continuing to talk to other employees on nonwork subjects, ignoring recent warnings to stop such conduct. This inconsistent treatment diminishes the deference to which the ALJ's finding is entitled. See Asarco, 86 F.3d at 1406.

An ALJ may not rest its entire decision that antiunion animus motivated an employee's discipline on a finding that the employer gave a pretextual reason for its action. See, e.g., Union-Tribune Publishing Co., 1 F.3d 486; Goldtex, Inc., 14 F.3d at 1011 (evidence of pretext does not "enter the picture until some evidence of a discriminatory discharge has been brought forward."). Discrediting the employer's stated reason for disciplinary action can lead a factfinder to "infer that there is another motive [and that] the motive is one that the employer desires to conceal—an unlawful motive—at least where, as in this case, the surrounding facts tend to reinforce that inference." Shattuck Denn Mining

24

Corp. (Iron King Branch) v. NLRB, 362 F.2d 466, 470 (9th Cir. 1966); see also Jet Star, 209 F.3d at 678; Laro Maintenance Corp. v. NLRB, 56 F.3d 224, 230 (D.C. Cir. 1995). However, "[a] finding of pretext, standing alone, does not support a conclusion that [discipline] was improperly motivated," absent other evidence of animus. Union-Tribune Publishing Co., 1 F.3d at 491. In this case, the ALJ gave inconsistent treatment to the evidence that contributed to the finding of pretext. This first category of evidence, even under deferential review, is not sufficient to support a finding of antiunion animus.

The ALJ and Board also relied on evidence that Valmont did not investigate whether Lewis and Sharp might have been talking about a work-related matter – which would not have violated any rule - until after issuing the warnings. The dissenting panel member found the absence of a meaningful investigation irrelevant because "the Act does not compel an employer to have a 'meaningful investigation' of suspected misconduct." The cases hold that absence of a meaningful investigation into allegedly impermissible conduct before imposing discipline is an accepted form of circumstantial evidence of antiunion animus. See Esco Elevators, 736 F.2d at 299 n.5 ("A one-sided investigation into employee misconduct supplies significant evidence that disciplinary action was triggered by an unlawful motive."); NLRB v. Big Three Indus., Inc., 497 F.2d 43, 50 (5th Cir. 1974) (holding that it was of "some relevance" that the employee was not "afforded a reasonable

25

opportunity to explain the full circumstances of what occurred"). In this case, the credited evidence showed that Valmont gave Lewis no chance to explain and Valmont did not try to verify Sharp's explanation until after issuing the warnings.

Valmont argues that it reasonably relied on Gregg's and Dotson's statements in concluding that Sharp and Lewis had not talked about work-related matters. Valmont points to Dotson's testimony that he prepared his written statement on his own, on July 28, and gave it to his supervisor on the same day. However, the ALJ found that the credited evidence established that Dotson did not prepare his written statement until asked to do so on August 6, 1997. There is substantial evidence to support the ALJ's choice to discredit Dotson's testimony that he prepared and submitted a written statement on the day of the incident, rather than a week later, and this court defers to that credibility choice. See Asarco, 86 F.3d at 1406; Advance Transportation, 979 F.2d at 572.

Valmont also asserts that the ALJ and the Board inconsistently discounted Dotson's and Gregg's estimate of the time and length of the conversation they observed, while crediting Lewis's and Sharp's testimony on the same subjects. This argument ignores the fact that Dotson and Gregg both testified that they did not look at a clock or watch, had no basis for estimating the time, and could not explain how they were able to submit written statements that gave a definite time for the conversation between Lewis and Sharp. By

26

contrast, Sharp consistently testified that he knew precisely what time he talked with Lewis, because he looked at his watch to record the time, as required on the maintenance request form. The ALJ found that Gregg's and Dotson's statements as to the time and length of the conversation they witnessed were unreliable and conflicted with their testimony. There is sufficient evidence to support the ALJ's choice to believe Lewis and Sharp over Dotson and Gregg. See Asarco, 86 F.3d at 1406; Advance Transportation, 979 F.2d at 573 ("The law is clear: Where there are two materially conflicting versions of the same incident, an ALJ's credibility determinations are entitled to deference.").

Valmont's contention that the ALJ erred in finding that Valmont failed to conduct a meaningful investigation before issuing the warnings depends on a rejection of the ALJ's credibility judgments. The court must defer to these judgments. This second category of circumstantial evidence does give some support to the Board's finding that Valmont issued the warnings because of antiunion animus.

Valmont argues in its brief that the undisputed fact that Sharp had no reason to be in Lewis's work area or to talk with Lewis on work matters in the course of their regular duties made it reasonable for Valmont to believe that Lewis and Sharp were not talking about work. The ALJ found that even if Valmont reasonably, but mistakenly, believed that Lewis and Sharp were having a personal conversation, the discipline it imposed was more severe

27

than that imposed on other employees engaged in similar conduct. Valmont challenges the ALJ's and Board's findings that the discipline was disparate.

The ALJ examined Valmont's records and found "no evidence that any employee has ever been warned for loafing when engaging in a work related conversation." That is correct, but it does not apply if Valmont did reasonably believe that Lewis and Sharp were not talking about a work-related subject.

The evidence showed that before August 1, 1997, Valmont disciplined other employees for "loafing" or distracting others by engaging in nonwork-related conversations. In one case, the employee received a verbal warning for distracting other employees by having nonwork-related conversations, and then committed three subsequent similar infractions before receiving a written corrective action. The evidence shows that at least two other employees received warnings for loafing prior to August 1997. One employee received a written warning, as his first discipline, for loafing and insubordination; one employee received a verbal warning for loafing and low quality work. Two employees received warnings for loafing shortly after August 1997. In one case, the offending employee was observed not working at various times during a day, including ten minutes spent at a picnic table. This employee received a verbal counsel that included the warning that any other offense of this nature could result in his termination. In the other case, the employee had stated that he was "killing time" when

28

his leadman observed him not working and asked him what he was doing. This employee received a final written notice.

The ALJ relied heavily on a finding of disparate discipline to show antiunion animus. However, the ALJ's analysis is again inconsistent. The ALJ credited the evidence that Abney had orally counseled Lewis in April or May 1997 for soliciting other employees, for the purpose of showing that Valmont believed that Lewis and Sharp were again talking about union activities on July 28. However, the ALJ rejected this evidence for the purpose of showing that Valmont issued Lewis the final warning on August 1 because he was continuing misconduct for which he had been recently warned. If this evidence of 1997 oral counseling is credited, then the August 1 discipline was for repeated recent misconduct and is not disparate from other discipline disclosed in the record. If the evidence is not credited, then the disparate discipline evidence is stronger, but the evidence of antiunion animus as a motivating factor is diminished.

The ALJ also relied on evidence that Valmont's plant manager and human resources manager had incorrectly applied the no-solicitation rule to prohibit soliciting in any work area, even on nonworking time. However, there is no evidence in the record that Valmont applied this approach to union soliciting but not to other forms of soliciting. This evidence might support an independent section 8(a)(1) violation, but not a section 8(a)(3) violation.

29

The Board cites cases to support the ALJ's reliance on circumstantial evidence to find antiunion animus. These cases present much stronger evidence of antiunion animus than is present in this record. Most of the cases involved very close timing between union activities and the employee discipline, a background of ongoing union hostility, or explicitly antiunion comments. These factors are conspicuously absent in this case. See, e.g., Adco, 6 F.3d at 1113, 1116-17 (observing that "Adco is adamantly anti-union" and noting that the employer admittedly fired one employee for soliciting, "an unlawful reason under the Act"); Esco Elevators, 736 F.2d at 299 n. 5 (record also disclosed explicitly antiunion statements, which, combined with the absence of investigation into the occurrence used to justify discharging the union president, supplied significant evidence of an unlawful motive); Big Three Indus., 497 F.2d at 51 (failure to investigate an incident which led to an employee's discharge, combined with the fact that at the time of the employee's discharge, the company was in the midst of vigorously contested union negotiations, supported Board's finding of unfair labor practice).

Other recent decisions relying on circumstantial evidence of discriminatory motive also involve a context of ongoing union hostility not present in this record. For example, in Dorsey Trailers, Inc. v. NLRB, 2000 WL 1769450 (4th Cir. Dec. 1, 2000) (no page references available), a company facing an imminent strike had moved its plant operations to a different state. The company had

30

refused to bargain with the union, a supervisor had made repeated threats that the company would close the plant if the employees voted to strike, the company refused to reinstate union members immediately after their unconditional offer to return to work, the company created the impression of surveillance, and the company unilaterally instituted a new attendance policy in violation of the collective bargaining agreement.[3]   Similarly, in General Fabrications Corp., 222 F.3d at 226, the court inferred antiunion animus from the facts that the employee's supervisor gave false testimony, the company undertook no meaningful investigation into the employee's work record, the employee was not warned or previously disciplined for the offense for which he was terminated, and the company's general manager had previously made antiunion remarks.  Id.

Valmont had no history of violations of the Act.  The union election had occurred in September 1996.  The ALJ did not rely on, and the evidence did not establish, temporal proximity between the union's resumption of activity in late July 1997 and Valmont's issuance of the warnings to Lewis and Sharp.  One of the strongest forms of circumstantial evidence – the link of timing – is missing.

In summary, there is some credited circumstantial evidence that might suggest an improper motive behind the warnings issued to

---

[3]      The Fourth Circuit ultimately concluded that Dorsey Trailers met its burden of showing that it would have relocated for economic reasons even in the absence of antiunion animus and did not violate section 8(a)(3) by moving the plant.

Lewis and Sharp, particularly the evidence as to how Valmont handled the investigation. However, absent evidence of a connection between the resumption of union activity and the warnings, the evidence of antiunion animus as a motivating factor is simply not substantial. The evidence of Valmont's antiunion animus does not approach the nature or quantity of evidence in other cases finding a section 8(a)(3) violation. This court denies enforcement of the Board's Order as to the warnings issued to Lewis and Sharp.

**B.    The Discharge of Lewis and the Warning of Fontenot**

Valmont discharged Lewis and warned Fontenot for violating the company's no-solicitation rule, which provides that "[s]olicitation by employees on their working time or on the working time of any employee solicited is prohibited . . . ." The parties dispute the application of the rule to this case, but do not dispute the validity of the rule itself. It is "well-settled that it is within the province of an employer to promulgate and enforce a rule prohibiting [] solicitation during working hours." Cooper Tire & Rubber Co. v. NLRB, 957 F.2d 1245, 1249 (5th Cir. 1992). Absent proof of special circumstances, however, "[i]t is not within the province of the employer . . . to promulgate and enforce a rule prohibiting [] solicitation by an employee outside of working hours, although on company property." Id.

32

An employer must permit solicitation during meals, breaks, and other nonworking time, even if the employee remains "clocked in" during such times. Cooper Tire, 957 F.2d at 1249 n.7. "[T]ime outside working hours, whether before or after work, or during luncheon or rest periods, is an employee's time to use as he wishes without unreasonable restraint . . . ." Id. In Cooper Tire, this court held that an employer had to permit solicitation "during any break times or in any break areas, including the . . . pathways to the main break room, when both the solicitor and solicitee are on break time, whether formal or scheduled, and are in a break area." Id. at 1251 n.11. A no-solicitation rule that prohibits solicitation on the company's premises during "paid working hours" is invalid because it could apply to bar solicitation en route to and from the timeclock, in the break room and in the rest rooms. Id. at 1248-50. On its face, the Valmont rule validly prohibited solicitation during the working time of the employees soliciting or being solicited.

The ALJ found that Valmont discharged Lewis based on Hutchison's report that Lewis had solicited him to sign a union card on Hutchison's working time and in a working area. The ALJ credited Lewis's testimony that his exchange with Hutchison about signing a union card occurred in a non-production area of the plant during the regularly scheduled break period. The ALJ found that Hutchison had lied about where the conversation took place and testified inconsistently about when it occurred. Based on the

33

credited evidence, the ALJ concluded that Valmont had discharged Lewis for misconduct that he did not commit, while he was engaged in protected activity, a violation of section 8(a)(1).

It is undisputed that at the time Lewis solicited Hutchinson, the day shift was on break. Hutchison normally worked the day shift. On August 12, Hutchison worked during part of the day shift. However, Hutchison was working overtime and did not join the day shift break. When Lewis encountered Hutchison, Hutchison had just left the break room, was not at his regular work station, and was not actively performing production duties.

The ALJ found that although Hutchison did not regard himself as on break, he was "not working; he was wandering around the plant looking for a coworker who was on break." Although Hutchison was not on break, "there was certainly no way that Lewis, or anyone else, could have been aware of that fact." The unusual and narrow question these facts present is whether an employee who is solicited during a shift-wide break period, just after exiting a break room, who is clocked in and not on an official break, but who is not performing the usual duties of his job, and who appears to be on break, is "on working time" for the purpose of a no-solicitation rule.

Valmont argues that it should be able to discharge Lewis for soliciting Hutchison because Hutchison was not, in fact, on break. Valmont claims that the soliciting employee, not the employer, should bear the risk that the employee being solicited is not on

34

break, even if he appears to be. This court's holding in <u>Cooper Tire</u> addressed a similar argument. In <u>Cooper Tire</u>, 957 F.2d at 1250, the Fifth Circuit recognized the difficulty in terms such as "working time" and "work areas," but rejected the employer's argument that these difficulties justified a blanket prohibition on all soliciting except in the break room itself. The court held that the employer had to permit solicitation "during any break times or in any break areas, including the . . . pathways to the main break room, when both the solicitor and solicitee are on break time, whether formal or scheduled, and are in a break area." <u>Id.</u> at 1251 n.11. In so holding, the court specifically rejected the employer's argument that "it should not be required to take the risk that a non-working employee will disrupt the production of employees who are continuing to work, since some employees will be working while other employees are on their breaks . . . ." <u>Id</u>. at 1250. The court held that such a risk was properly on the employer, unless it could show special circumstances that justified a broader prohibition.

This case presents narrow and unusual facts. The soliciting employee was on an official break. The solicited employee was not on the official break, but was not performing the usual duties of his job and gave every outward appearance of being on break himself. The Board found that Lewis did not violate the no-solicitation rule by soliciting Hutchison because Hutchison was not on working time for the purpose of that rule. That finding is

35

supported by substantial evidence in the record and is a reasonable application of the law, to which this court must give deference.

The ALJ and Board concluded that Valmont's firing of Lewis for conduct prohibited by the no-solicitation rule violated section 8(a)(3) of the NLRA. However, the analysis the ALJ and Board used is a section 8(a)(1) analysis, not a section 8(a)(3) analysis. "Over and again the Board has ruled that section 8(a)(1) is violated if an employee is discharged for misconduct arising out of a protected activity, despite the employer's good faith, when it is shown that the misconduct never occurred." Ideal Dyeing & Finishing Co., 300 N.L.R.B. 303, 319 (1990). The ALJ and Board found that while Valmont's no-solicitation rule was valid, Lewis did not in fact violate the rule because Lewis was on break and Hutchison was not working when the solicitation occurred. The presence of Valmont's good faith belief that Lewis violated the no-solicitation rule is irrelevant to this section 8 (a)(1) violation. The absence of such a belief is, however, necessary to a section 8(a)(3) violation.

The ALJ made no specific findings or analysis of the factors that might show antiunion animus, necessary to a section 8(a)(3) violation. The Board went beyond the findings of the ALJ, "infer[ring] that [Valmont's] discharge of Lewis was motivated by its hostility to what it believed were his pro-Union sentiments." There is no dispute that Lewis talked to Hutchison to further the union. However, neither the ALJ nor the Board provided reasons for

36

concluding that hostility to the union motivated Valmont's decision to discharge Lewis, as required under section 8(a)(3). Specifically, neither addressed Valmont's assertion that it had a reasonable, if incorrect, basis for believing that Lewis violated the no-solicitation rule by soliciting another employee who was not on break.

This court affirms the Board's finding that Valmont violated section 8(a)(1) by suspending, then discharging, Lewis for violating the no-solicitation rule; this court does not uphold the Board's finding that this conduct also violated section 8(a)(3).

As to Fontenot, the ALJ found that Valmont violated sections 8(a)(1) and 8(a)(3) by issuing Fontenot a warning for violating the no-solicitation rule. The ALJ disbelieved Hutchison's testimony about the incident and adopted Fontenot's version of the events. Fontenot testified that she visited Hutchison to ask him about the scrap metal and, at the end of that discussion, as they walked toward the timeclock, asked Hutchison whether he had signed a union card. Specifically, the ALJ stated: "I do not credit any of Hutchison's varying accounts of his conversation with Fontenot. His demeanor was not impressive. . . . I do not credit his attribution of an ulterior motive to Fontenot." The ALJ found that Fontenot's question did not constitute solicitation, but was merely a question of another employee, similar to asking whether the employee had brought a specific item for lunch and receiving a brief answer. The ALJ found that "[r]espondent's warning of

37

Fontenot for allegedly engaging in solicitation when, in fact, she had only asked a question of a fellow employee, violated Section 8(a)(3) of the Act."

The ALJ found that Fontenot did not solicit Hutchison, while assuming that Lewis did. Lewis testified that his conversation with Hutchison consisted of the following:

> Lonny, I guess you're not going–I guess you decided not to sign a card. He said I hadn't made my mind on which way I'm going. I said let me know when you do. He said ok.

(Hearing Transcript, p. 277).

Fontenot testified as follows as to her conversation with Hutchison:

> I asked him, well, did you sign a Union card? . . .He said no.... I said great. . . .

(Hearing Transcript, p. 182). Characterizing Lewis's question as solicitation and Fontenot's as "merely a question" emphasizes the very slight differences between the two exchanges and points to the undefined nature of "solicitation."

The ALJ did not examine whether Fontenot's question, if not solicitation, was nonetheless protected activity under section 7. If not, there is no independent violation of section 8(a)(1). See Mobil Exploration, 200 F.3d 230. The ALJ held that Fontenot's question was not solicitation but applied section 8(a)(1) as if the protected activity of solicitation occurred. Neither the ALJ nor the Board analyzed whether, apart from section 8(a)(1), Valmont violated section 8(a)(3) by issuing the warning to Fontenot. The

38

section 8(a)(3) question requires an analysis of whether, when Valmont warned Fontenot for soliciting while she and another coworker were still working, it had a reasonable, if incorrect, belief that Fontenot had violated the no-solicitation rule. The ALJ applied an incorrect legal analysis for determining whether Valmont violated sections 8(a)(1) and (a)(3) by warning Fontenot. This court analyzes the record as a whole, applying the correct legal standard, to determine whether Valmont nonetheless violated sections 8(a)(1) and (a)(3) by warning Fontenot. See CWI of Maryland, 127 F.3d at 332.

In contrast to the firing of Lewis, the record provides substantial credited circumstantial evidence that Valmont acted with antiunion animus in issuing Fontenot the written warning. The ALJ found that Hutchison's attribution of "ulterior motives" to Fontenot and his description of the conversation wholly lacked credibility. The record discloses that Fontenot's leadman supported her consistent explanation of her work-related reason for talking to Hutchison. Hutchison himself acknowledged that the scrap metal was his responsibility. The credited evidence was that Fontenot asked one question, which underscores the severity of the discipline imposed. The record shows that Valmont management received inconsistent and unsupported information from Hutchison about his encounter with Fontenot. The record also shows that Valmont management knew that Hutchison vehemently opposed the union. In issuing a written warning to a first time offender, with

39

no prior oral counseling or warning, Valmont departed from its own progressive discipline policy. See Marshall Durbin Poultry Co., 39 F.3d at 1312 (departure from past disciplinary practice can be evidence of antiunion animus).

This court must defer to the ALJ's credibility findings. Although the ALJ applied an incorrect legal standard, substantial evidence supports the ALJ's finding that Valmont violated section 8(a)(3) by issuing Fontenot a written warning, and therefore violated section 8(a)(1). The Board's Order with respect to Valmont's written warning of Fontenot is enforced.

C.   The Warning of Niemeyer

The ALJ found a section 8(a)(1) and 8(a)(3) violation in the oral counseling issued to Niemeyer because the plant entrance in which he distributed union literature was not a work area. "An employer may lawfully prohibit his employees from distributing literature concerning their working conditions in work areas or during work time." NLRB v. Transcon Lines, Inc., 599 F.2d 719, 721 (5th Cir. 1979); see also Eastex, Inc. v. NLRB, 437 U.S. 556, 570-71 (1978); Republic Aviation Corp. v. NLRB, 324 U.S. 793, 798-99 (1945). The employer, however, may not "extend[] this prohibition to non-working areas during non-work time . . . unless the employer shows that a ban is necessary to maintain plant discipline or production." Transcon Lines, 599 F.2d at 721; Republic Aviation, 324 U.S. at 798-99.

40

Valmont argues that the entranceway area near the timeclock, in which Forman witnessed Niemeyer distributing leaflets, was a "work area" under the no-solicitation rule. The issue is whether substantial evidence supports the ALJ's conclusion that the timeclock area was not a "work area."

The record shows that the entrance to the building at issue opens into an area 15 feet long and 8 feet wide. The timeclock and a bulletin board were mounted on the wall to the right of the entrance; a desk, with a computer, were positioned on the same side as the timeclock and bulletin board; and a vending machine with drinks was on the opposite wall. Forman was seated at the desk when he observed Niemeyer handing out the leaflets, but was not actively working.

Valmont contends that the area is a work area because of the presence of the desk and computer, which foremen occasionally used. The ALJ found that Valmont used the area for both work and nonwork activities but failed to convey clearly to employees whether it was, or was not, a working area. Resolving the ambiguity in favor of Niemeyer, the ALJ found a violation of section 8(a)(3) in the discipline imposed on Niemeyer for distributing literature on nonworking time, in a nonworking area.

As early as 1971, the NLRB noted that "it is well recognized that the timeclock area usually is not part of the work area of a plant." Midwest Tool and Engineering Co., 192 N.L.R.B. 1104, 1107 (1971). In that case, the Board affirmed the ALJ's finding that

41

the area in front of and around a timeclock was not a work area, noting that employees often congregate around a timeclock; bulletin boards are often kept near timeclocks; and work is generally not performed around timeclocks. Id. In Thermo Electric Co., 222 N.L.R.B. 358 (1976), by contrast, the Board upheld the application of a facially valid no-solicitation rule to prevent distribution in front of a timeclock which was "in a work area."

The decisions recognize that entrance areas to plants, where timeclocks, vending machines, and bulletin boards are located, are often mixed use areas. Courts generally require a particularized showing for an employer to apply a no-solicitation rule in such an area. In Transcon Lines, 599 F.2d at 721, this court found that a "drivers' room" at a trucking company's terminal, which contained a bulletin board, a timeclock, and coffee, soft drink and candy vending machines was a mixed use area. Id. at 719. The court concluded that although some work did take place in the drivers' room, it was a mixed use area for the purpose of the no-solicitation rule. The ban on distributing literature in that area was presumptively invalid absent a showing that it was "necessary to maintain plant discipline or production." Id. at 721.

Similarly, in United Parcel Service, 1998 WL 915578 (N.L.R.B. 1998), the Board concluded that the company violated the Act by enforcing its no-distribution rule in a check-in area. The ALJ concluded that the check-in area was a nonwork area, or, at most, a mixed use area, making the employer's application of its no-

42

distribution rule to that area presumptively invalid.  The Board found that the application of the no-distribution rule was unlawful absent a showing that "the distribution resulted in any disruption of production or discipline."  Id. at *2.

This court finds that substantial evidence in the record supports the ALJ's finding that the Valmont entranceway in question was a mixed use area. The presence of the timeclock, bulletin board, and vending machine in the building entranceway, with the foremen's desk, are all consistent with a mixed use characterization.  Valmont bears the burden of making a particularized showing that application of its no-distribution rule to that area is valid.  See, e.g., UPS v. NLRB, 228 F.3d 772 (6th Cir. 2000).  Valmont has not made the required showing.  By applying its no-solicitation policy to Niemeyer's conduct without such a particularized showing, Valmont violated section 8(a)(1) of the Act.

The ALJ did not apply a section 8(a)(3) analysis to Niemeyer's case.  The ALJ does not cite, and the record does not contain, substantial evidence that Valmont was motivated by antiunion animus when it gave Niemeyer the oral warning.  There is no evidence that Valmont treated the distribution of union literature differently than it did the distribution of other literature. See National By-Products, Inc. v. NLRB, 931 F.2d 445 (7th Cir. 1991) (showing of discriminatory application of no-solicitation rule provides evidence of section 8(a)(3) violation).  Nor is there any evidence

43

on the record that an oral warning was disparate punishment or inconsistent with Valmont's progressive discipline. The ALJ's conclusory finding that Valmont violated section 8(a)(3) by erroneously applying its valid no-solicitation rule to Niemeyer is not supported by substantial evidence.

This court affirms the NLRB's conclusion that Valmont violated section 8(a)(1) when it orally warned Niemeyer for distributing union literature in the entranceway near the time clock. This court does not find substantial support in the record for a finding of a section 8(a)(3) violation.

## IV. CONCLUSION

Substantial evidence supports the Board's finding that Valmont violated section 8(a)(1) by suspending and discharging Lewis and by warning Niemeyer. Substantial evidence also supports the Board's conclusion that Valmont violated sections 8(a)(1) and 8(a)(3) by warning Fontenot. The Board's conclusion that Valmont violated sections 8(a)(1) and 8(a)(3) by warning Lewis and Sharp and violated section 8(a)(3) by warning Niemeyer are not supported by substantial evidence on the record as a whole. This court grants in part and denies in part Valmont's petition, as set forth above. Accordingly, enforcement of the Board's Order is granted in part and denied in part. On remand, the Order shall be modified to conform with this decision.

ENFORCEMENT GRANTED IN PART, DENIED IN PART, AND REMANDED.